UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------------x

MARIE ALEXANDRINE BALDIA,
a/k/a MARIE ALEXANDRINE NADELA,
on behalf of herself and of all others similarly
situated,

<em>Plaintiff</em>,

Index No. 19-cv-11268 (PGG)

- against -

**AMENDED COMPLAINT**
(Class Action)

RN EXPRESS STAFFING REGISTRY LLC,
SALLY NUNEZ and ALEXANDER
ALEJANDRINO,

<em>Defendants.</em>

----------------------------------------------------------------------x

**Plaintiff** MARIE ALEXANDRINE BALDIA, also known as MARIE ALEXANDRINE NADELA, by undersigned counsel, on behalf of herself and all others similarly situated, as and for her amended complaint against Defendants RN Express Staffing Registry LLC, Sally Nunez, and Alexander Alejandrino, alleges as follows:

<u>**PRELIMINARY STATEMENT**</u>

1.     This is an action for damages and injunctive relief for violations of the Trafficking Victims Protection Act (TVPA), 18 U.S.C. §§ 1589, *et seq.*, the Fair Labor Standards Act (FLSA), 29 U.S.C. §§ 201 *et seq.*, and the New York Labor Law, Article 19, §§650 *et seq.*, for breach of the parties' employment contract, and for a declaratory judgment that a $33,320 promissory note indenture is unenforceable under the TVPA, the 13th Amendment to the United States Constitution, and New York or common law.

2.     The TVPA, FLSA, NYLL, declaratory judgment, and breach of contract claims are brought as a class action, pursuant to Rules 23(b)(2) and 23(b)(3) of the Federal Rules of

Civil Procedure, on behalf of all Filipino licensed nurses who worked for Defendant RN Express Staffing Registry, LLC since December 9, 2009 under an employment contract containing a $33,320 so-called "liquidated damages" clause.

3.      This action arises out of Defendants' recruitment, provision and/or obtaining of Plaintiff's labor or services through the use of fraud and the abuse of the immigration process that resulted in the forced labor and wage exploitation of the Plaintiff by Defendants.

4.      Defendants are foreign labor recruiters who have recruited more than 100 NY-licensed nurses from the Philippines to work for Defendants in the state of New York under contracts of indentured servitude.

5.      Defendants made false and fraudulent promises in their immigration sponsorship petitions with regard to the payment of prevailing wages to lure Plaintiff and other Filipino licensed nurses into employment, only for the Plaintiff and the other licensed nurses to later realize Defendants did not intend to and did not correctly pay them their offered prevailing wage rates.

6.      Plaintiff was forced under the circumstances to continue working for Defendants despite her complaints of not being paid the prevailing wage rate because of Defendants' threats to have her pay the $33,320 indenture.

7.      While Defendants characterize the $33,320 indenture as "liquidated damages", there is in fact no basis for this claim. To keep the Plaintiff and other similarly-situated licensed nurses from leaving their employment, the Defendants threatened the Filipino licensed nurses with serious harm, including threats to enforce the draconian penalties in their employment contracts.

8.      On behalf of herself and all other Filipino licensed nurses employed by the Defendants, Plaintiff seeks: compensatory, punitive and emotional distress damages for violations of the Trafficking Victims Protection Act (18 U.S.C. §1589 and 18 U.S.C. §1590); compensatory and liquidated damages and pre- and post-judgment interest for violations of the Fair Labor Standards Act (29 U.S.C. §§ 201 *et seq.*), New York Labor Law and for breach of contract; an injunction prohibiting Defendants from threatening to enforce or enforcing the indenture in the employment contracts; a declaration that the indenture is unenforceable under the TVPA and the 13th Amendment to the U.S. Constitution, 42 U.S.C. § 1994; an award of reasonable attorney's fees and costs as authorized by 18 U.S.C. 1595(a); and such other relief as the Court deems just and proper.

## JURISDICTION AND VENUE

9.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 (federal question), 18 U.S.C. §1595(a) (Trafficking Victims Protection Act) (TVPA, 18 U.S.C. 1589, 1590), and 29 U.S.C. §§ 201 *et seq.* (Fair Labor Standards Act), in that these claims are asserted under the laws of the United States.  This Court has supplemental jurisdiction over Plaintiff's pendent state/common law claims pursuant to 28 U.S.C. §1367 because the state/common law claims form part of the same case or controversy as the federal law claims.

10.     Venue is proper in this District pursuant to 28 U.S.C. §1391(b) because a substantial part of the events or omissions giving rise to the claims occurred in the Southern District of New York. Venue is also proper in this Court under 28 U.S.C. §1391(c) because Defendant company is deemed to reside in this judicial district where Defendant company has owned, operated, managed, and maintained a nursing staffing company where the named Plaintiff was employed and is subject to personal jurisdiction.

## PARTIES

11.    Plaintiff MARIE ALEXANDRINE BALDIA, also known as MARIE ALEXANDRINE NADELA ("Plaintiff") is a registered nurse licensed in the state of New York, and was an employee of the Defendants. She is a citizen of the Philippines and was, at all times relevant from September 2017 through January 2020, a resident of Nassau County, state of New York.   Since middle of January 2020 to the present time, she has been residing in the state of Texas.

12.    Defendant RN EXPRESS STAFFING REGISTRY, LLC ("Defendant RN Express") is, upon and information, a limited liability company duly organized and existing under the laws of the state of New York. Likewise upon information and belief, it maintains an office at 71 West 23rd Street, Suite 1622, New York, NY 10010, within this District.

13.    Upon information and belief, Defendant RN Express was, at all times relevant, a healthcare staffing services provider, and was engaged in providing registered nurses, among other healthcare professionals, to work at various healthcare facilities within the United States, including in counties covered by this District.

14.    Upon information and belief, Defendant RN Express employs or employed more than four (4) workers who fall under the category of "non-exempt employees" pursuant to the FLSA, and these employees regularly and recurrently either engaged in commerce or handled or otherwise worked on goods or materials that had been moved in or produced for commerce, such as when they handled credit card transactions or when they accepted delivery of supplies ordered from out-of-state.

15.     Defendant SALLY NUNEZ ("Nunez") was, upon information and belief, at all times relevant, the Chief Executive Officer, a managing member and/or agent of Defendant RN Express.

16.     Defendant ALEXANDER ALEJANDRINO ("Alejandrino") was, upon information and belief, at all times relevant, the Administrator, an executive officer, a managing member and/or agent of Defendant RN Express.

17.     Upon information and belief, Defendants RN Express, Nunez, and Alejandrino had the power to hire and fire the Plaintiff, establish and pay her wages, set her work schedules and maintain her employment records.

18.     At all relevant times, and upon information and belief, Defendants RN Express, Nunez, and Alejandrino transacted business communications and negotiated agreements from their New York City office with their clients and/or employees, utilizing in the process the postal service or other courier delivery service, the phone, fax, and/or email communications systems that moved along interstate boundaries, including with individuals and organizations with addresses outside the state of New York, such as, but not limited to, the Philippines.

19.     Upon information and belief, at all relevant times, Defendants RN Express, Nunez, and Alejandrino regularly communicated with their employees, including herein Plaintiff, through phone, text, fax and/or email service systems. From their New York City office, Defendants gave instructions to their employees with regard to their staffing assignments and/or instructions, and, upon information and belief, made inter-bank transactions, such as making direct deposits to their employees' bank accounts from their banks opened and maintained in New York.

20.     Upon information and belief, at all relevant times, Defendants sourced out and entered into staffing agreements with healthcare facilities located all over the country, and in the process engaged in acts that have effects in New York, such as when they signed staffing agreements with healthcare facilities, and/or sent staffing agreements or staffing assignments to their clients or to their employees, including to herein Plaintiff, out of their New York City office.

21.     Defendants, through their human resources officers, case managers or nurse recruiters, communicated with Plaintiff and other Filipino nurse-recruits, during all times relevant, either through phone, text, and/or email communications, and gave instructions to Plaintiff and other Filipino nurses regarding their immigration sponsorship issues, work assignments, scheduling, duties, and payroll issues, including when the Plaintiff and other Filipino nurses were still in the Philippines.

22.     Upon information and belief, at all times relevant, Defendants RN Express, Nunez, and Alejandrino determined Plaintiff's and other Filipino nurses' places of employment, established the terms of their employment, controlled their work schedules and supervised their work.

23.     Defendants Nunez and Alejandrino, upon information and belief, exercised complete domination and control of Defendant RN Express in respect to the conduct alleged in this Complaint, including violations of the Trafficking Victims Protection Act designed to coerce the continued performance of Plaintiff and other Filipino nurses under their employment contracts notwithstanding the Defendants' failure to pay their required prevailing wages.

24.     Defendants Nunez and Alejandrino, upon information and belief, used their complete domination and control of Defendant RN Express to commit wrongs against Plaintiff

and other Filipino nurses, including violations of the Trafficking Victims Protection Act designed to coerce the continued performance of Plaintiff and other Filipino nurses under their contracts notwithstanding the Defendants' failure to pay their required prevailing wages.

25.     Defendants RN Express, Nunez, and Alejandrino are associated in fact and comprise a venture as that term is used in the Trafficking Victims Protection Act, 18 U.S.C. §§ 1589 and 1595.

26.     At all relevant times, Defendants were and continue to be an "enterprise engaged in commerce" because they utilized essential business equipment, such as computers and printers, and other supplies that, upon information and belief, were manufactured outside the state of New York and were moved in interstate commerce.

27.     Upon information and belief, at all relevant times, Defendants regularly used, sourced out and ordered their office supplies by ordering either through the telephone or through online, with supply and distribution companies various supplies, such as bond papers, ball pens, ink cartridges, staplers and staples, which were either manufactured outside the state or delivered crossing state lines.

28.     Upon information and belief, Defendants regularly earned more than $500,000 in annual gross revenues, at all times relevant.

29.     All of the acts alleged in this Complaint were authorized, ordered, and implemented by Defendants.

**STATEMENT OF FACTS**

30.     Plaintiff is a nurse by training or education, having graduated with a Master's degree in Nursing from an educational institution in the Philippines.

31.     At all times relevant, Plaintiff was licensed to practice as a registered nurse in the state of New York.

32.     Plaintiff had more than five years of relevant experience working as a registered nurse in the Philippines.

33.     Upon information and belief, for more than ten years, Defendants RN Express, Nunez, and Alejandrino have recruited Filipino nurses to work for their company. Throughout this time, the Defendants have required the Filipino nurse-recruits to execute a standard Employment Agreement.

34.     Sometime February 2016, Defendants Nunez and Alejandrino went to Davao City, Philippines and recruited Plaintiff to be sponsored and to be employed by Defendants for the position of Registered Nurse Supervisor with compensation pursuant to prevailing wage law.

35.     Plaintiff accepted Defendants' offer of employment for the position of Registered Nurse Supervisor with compensation pursuant to prevailing wage law.

36.     Pursuant to their agreement, the Defendants caused the filing of a Form I-140 immigrant petition on behalf of the Plaintiff with the U.S. Citizenship and Immigration Services (USCIS) of the U.S. Department of Homeland Security (USDHS) on or about April 15, 2016.

37.     Upon information and belief, in filing Form I-140 immigrant petition on Plaintiff's behalf, Defendants, as petitioning employer, promised the U.S. Citizenship and Immigration Services (USCIS) that they would pay Plaintiff, their beneficiary, at least the prevailing wage rate for the offered position (Registered Nurse Supervisor) at the area of employment.

38.     Upon information and belief, Defendants submitted to the Immigration Service Form ETA 9089 which included this promise to pay Plaintiff at least the prevailing wage rate. In

the Form ETA 9089, Defendants also promised that they would be "able to place the alien on the payroll on or before the date of the alien's proposed entrance into the United States" and that the job opportunity "was not vacant".

39.     Likewise upon information and belief, before Defendants RN Express, Nunez, and Alejandrino filed the Form I-140 petition with the Immigration Service, they applied with the U.S. Department of Labor (USDOL) and secured the prevailing wage rate for the offered position in the area or site of employment.

40.     Upon information and belief, Defendants sought the prevailing wage rate for a Registered Nurse Supervisor position in the metropolitan statistical area of New York City and suburbs, in the state of New York.

41.     Upon information and belief, Defendants sponsored Plaintiff as an EB-2 immigrant worker, which meant that the position they offered her was a supervisory position that required at least a Master's degree in Nursing, or at least Bachelor's degree in Nursing and five years of relevant nursing experience.

42.     By signing the Form I-140 petition and the Form ETA 9089, Defendants RN Express and/or Alejandrino certified under penalty of perjury that the information contained in the petition and the evidence submitted with it were true and correct.

43.     The Form I-140 immigrant petition filed by Defendants on behalf of the Plaintiff was approved by the U.S. Citizenship and Immigration Services in or about May 2016.

44.     As a result of the approval of Defendants' Form I-140 immigrant petition, Plaintiff was scheduled to be interviewed for the issuance of her immigrant visa by the U.S. Embassy in Manila, Philippines on or about May 18, 2018.

45.     Prior to her interview date, or on or about May 8, 2018, Defendants communicated to Plaintiff informing her that they had sent her three documents, two of which they required Plaintiff to sign. The first document was the Offer-Letter to be submitted by the Plaintiff to the U.S. consul during her visa interview. The second document was the Employment Agreement, which Defendants required Plaintiff to sign and to be notarized. The third document was a Promissory Note, which Defendants likewise required Plaintiff to sign and to be notarized.

46.     The Offer-Letter reiterated the offer of employment to the Plaintiff for the position of Registered Nurse Supervisor with an annual compensation of $99,008. It was dated May 3, 2018, signed by Defendant Alejandrino and was notarized on May 8, 2018.

47.     The Employment Agreement was, upon information and belief, a standard employment contract prepared by Defendants which they required their nurse-employees to sign.

48.     The Defendants' standard employment contract for nurses, such as the one Plaintiff was required to sign, provided that in exchange for immigration sponsorship and employment, the Healthcare Professional candidate promised to work for Defendants for a three-year period.

49.     The Defendants' standard employment contract likewise provided that the Healthcare Professional candidate "will be paid the higher (sic) of the prevailing wage for the occupation as determined by the U.S. Department of Labor for the particular Facility to which Healthcare Professional is assigned".

50.     The Defendants' standard employment contract likewise provided that "in the event that Healthcare Professional terminates the Employment Agreement without cause and does not complete the employment term or if the Company terminates the Employment Agreement with cause", "the Company Recruitment Costs" in the amount of "Thirty Three

Thousand Three Hundred Twenty Dollars ($33,320.00)" "shall become due and payable by Healthcare Professional to the Company as liquidated damages in accordance with the Promissory Note".

51.     The Employment Agreement received by the Plaintiff was already pre-signed by Defendant Alejandrino. Pursuant to the Employment Agreement, the position offered was that of Registered Nurse Supervisor; the term was for three years; the Plaintiff's promised compensation was the "prevailing wage for the occupation as determined by the U.S. Department of Labor for the particular facility to which Healthcare Professional is assigned", and; there was a provision for payment of $33,320 by the Plaintiff for terminating the contract prior to the expiration of the three-year term.

52.     The amount of $33,320 referenced in the Employment Agreement was allegedly Defendants' anticipated "Company Recruitment Costs".

53.     In addition to requiring the Plaintiff to sign the standard Employment Agreement before her interview date, the Defendants likewise required Plaintiff to sign a Promissory Note prepared by Defendants whereby Plaintiff was made to promise to pay to the order of Defendant RN Express the amount of $33,320.00, allegedly for value received "in the event that the Healthcare Professional (i.e, the Plaintiff) terminates the Employment Agreement without cause and does not complete the employment term or if the Company (i.e, Defendant RN Express) terminates the Employment Agreement with cause".

54.     Defendants required Plaintiff to return to them duly-executed copies of the Employment Agreement and the Promissory Note.

55.     On May 31, 2018, Plaintiff complied with Defendants' demand and sent them, by electronic communication, copies of the Employment Agreement and Promissory Note signed by her.

56.     Defendants specifically instructed Plaintiff that the Promissory Note "should not be presented during [your] interview" at the U.S. Embassy.

57.     The Offer-Letter signed by Defendant Alejandrino on behalf of Defendant RN Express was addressed to the U.S. Embassy in Manila, Philippines and it confirmed the offer of full-time employment to the Plaintiff as a Nurse Supervisor with an annual salary of $99,008.00.

58.     Upon information and belief, the prevailing wage rate for the position of a Level 4 Registered Nurse in the New York City metropolitan statistical area in May 2018 was $99,008.00.

59.     Upon information and belief, a Level 4 wage rate is assigned to a job offer for a competent employee who has sufficient experience in the occupation to plan and conduct work requiring judgment and the independent evaluation, selection, modification and application of standard procedures and techniques. The employee generally has management and/or supervisory responsibilities.

60.     Upon information and belief, the Registered Nurse Supervisor position offered by Defendants to the Plaintiff and which was accepted by the Plaintiff required a Level 4 wage rate.

61.     Because of the signed Employment Agreement and the letter by Defendant Alejandrino confirming the job offer to the Plaintiff, the U.S. Embassy in Manila, Philippines issued Plaintiff on August 2, 2018 her immigrant visa or green card to enter and work as a Registered Nurse Supervisor in the United States.

62.     The immigrant visa issued to the Plaintiff fell under the IV category of E21, which meant that the visa was a second preference employment-based visa category for an individual holding an advanced degree or with an exceptional ability in his/her field.

63.     With the issuance and approval of her immigrant visa, Plaintiff entered the United States on or about September 27, 2018.

64.     On October 9, 2018, Plaintiff presented herself to Defendants ready to be given her work assignment.

65.     Defendants were not able to give Plaintiff employment in the position of Registered Nurse Supervisor or in any position when she entered the United States or when she presented herself to the Defendants ready for her work assignment on October 9, 2018.

66.     The Defendants' submission of the Form I-140 petition and the Form ETA 9089 to the U.S. Citizenship and Immigration Services and of the Offer-Letter to the U.S. Embassy in Manila, Philippines was false in every material respect. The Defendants never intended to employ Plaintiff as Registered Nurse Supervisor. They never intended to pay her the prevailing wage rate or at least $99,088 per year. They never intended to provide Plaintiff with employment as Registered Nurse Supervisor upon her entrance into the United States.

67.     Defendants gave Plaintiff orientation or training on or about October 15, 2018.

68.     During Plaintiff's orientation, Defendants' Human Resources Manager discussed several topics with the Plaintiff, and among those topics emphasized were the two documents Plaintiff was required to sign, which were the Employment Agreement and the Promissory Note.

69.     Defendants' Human Resources Manager explained to Plaintiff that her contract was for a three-year term, and that if she preterminated her contract, Defendants would enforce said contract and promissory note, and Plaintiff would be made to pay $33,320.

70.   Plaintiff understood from her orientation discussion with Defendants' Human Resources Manager that she would be required to pay $33,320 were she to preterminate her employment agreement.

71.   Sometime last week of October 2018, Defendants assigned Plaintiff to work at the Amsterdam Harbor Side Nursing Home in Port Washington, New York.

72.   Defendants were not able to immediately give Plaintiff employment after her orientation or training. They were not able to place Plaintiff on their payroll upon Plaintiff's arrival or entrance into the United States.

73.   Despite their promises on the Form I-140 immigrant petition and on the Form ETA 9089, Defendants were not able to provide actual work assignment to the Plaintiff until October 21, 2018.

74.   When Defendants did finally give Plaintiff work assignment, they required her to work as a nurse with the title of Registered Nurse, and not of Registered Nurse Supervisor.

75.   Even though the position or title given her by Defendants was that of a Registered Nurse position, Plaintiff actually performed the duties and responsibilities of a Registered Nurse Supervisor, as embodied in Defendant Alejandrino's letter to the U.S. Embassy in Manila, to wit: "supervise the provision of general nursing care to patients; administer prescribed medications and treatments in accordance with approved nursing techniques; prepare equipment and aid physicians during treatment and examination of patients; observe patients; record significant conditions and reactions; notify physician of patient's condition and reaction to drugs, treatment and significant incidents; conduct periodic patient rounds with newly hired nursing staff to ensure quality of care and ensure that nursing procedures are correctly conducted; and oversee the duties of LPNs, CNAs and newly hired nursing staff".

76.     Sometime on or about November 6, 2018, Defendant Alejandrino sent Plaintiff an email message containing her Pay Rate Notice pursuant to New York Labor Law. The Pay Rate Notice [Form LS 54 (02/15)] was signed by Defendant Alejandrino and contained handwritten notes that read: "actual rate  = $33/hr" and also "Paycom rate  = $40/hr".

77.     Confused about the meanings of the handwritten notes, Plaintiff communicated to Defendants and spoke with Defendant Alejandrino who explained to her that since she was just new in the job, she would be initially paid $33 per hour, but that her pay stubs would show $40 per hour.

78.     Plaintiff informed Defendant Alejandrino that she expected to be paid whatever her prevailing wage rate was. Plaintiff reminded Defendant Alejandrino that the Offer-Letter provided for an annual compensation of $99,008.

79.     Defendant Alejandrino told Plaintiff that the $33 hourly rate was just a temporary rate and that she would eventually be given her offered prevailing wage rate.

80.     Defendant Alejandrino also demanded that Plaintiff return the Pay Rate Notice signed by the Plaintiff. So, Plaintiff begrudgingly signed the form and returned it to Defendants, as required by Defendant Alejandrino.

81.     Starting from the time Plaintiff started working for Defendants in late October 2017, Defendants effectively paid her an hourly wage rate of about $33.00.

82.     Upon information and belief, the USDOL prevailing wage rate for a Level 4 Registered Nurse (Supervisor) working in Nassau County, New York for the period including October 2018 through June 30, 2019 was $48.68 per hour.

83. Upon information and belief, the USDOL prevailing wage rate for a Level 4 Registered Nurse (Supervisor) working in Nassau County, New York for the period starting on July 1, 2019 through June 2020 is $49.63 per hour.

84. Defendants continued to effectively pay Plaintiff the hourly wage rate of only about $33.00 to $34.00 through her last day of work.

85. Upon information and belief, the Defendants engaged and are engaging in a policy and practice of paying their Filipino nurse-employees less than the prevailing wages required by their employment contracts by not paying them all of their hours of work.

86. Upon information and belief, the Defendants regularly make arbitrary, unilateral deductions from their employees' number of work-hours and pay them at rates that almost approximate the prevailing wage rates, but because the number of hours paid is much less than the actual hours worked by the employees, the effective rate paid to the employees is only about thirty three dollars ($33.00) to thirty four dollars ($34.00) per hour, which is well below the prevailing wage rate.

87. As and by way of an example, Plaintiff performed nursing duties on the following days and times:

```
October 20, 2019 (Sunday)        = No work
October 21, 2019 (Monday)        = No work
October 22, 2019 (Tuesday)       = No work
October 23, 2019 (Wednesday)     = No work
October 24, 2019 (Thursday)      = from 7 am to 7 pm, or 11.5 hours
October 25, 2019 (Friday)        = from 7 am to 7 pm, or 11.5 hours
October 26, 2019 (Saturday)      = from 7 am to 7 pm, or 11.5 hours
                                 Total Weekly Work Hours    = 34.5 hours


October 27, 2019 (Sunday)        = from 7 pm to 7 am, or 11.5 hours
October 28, 2019 (Monday)        = No work
October 29, 2019 (Tuesday)       = from 7 am to 7 pm, or 11.5 hours
October 30, 2019 (Wednesday)     = No work
```

October 31, 2019 (Thursday)     = from 7 am to 7 pm, or 11.5 hours
November 1, 2019 (Friday)       = from 7 pm to 7 am, or 11.5 hours
November 2, 2019 (Saturday)     = No work
                                Total Weekly Work Hours     = 46 hours

88.    For this particular two-week pay period, Plaintiff submitted to Defendants her time sheets countersigned by the Director of Nursing or designee of the facility where Plaintiff worked. In this two-week pay period example, Plaintiff worked a total of 80.5 hours.

89.    Defendants arbitrarily deducted or reduced Plaintiff's work-hours, and credited Plaintiff only with the following work-hours, as shown on their employer-generated Web Time Sheets:

October 24, 2019 (Thursday)     = 11.5 hours
October 25, 2019 (Friday)       = 11.5 hours
October 26, 2019 (Saturday)     = 1.3 hours
                                Total Weekly Hours Credited = 24.3 hours


October 27, 2019 (Sunday)       = 11.5 hours
October 29, 2019 (Tuesday)      = 11.5 hours
October 31, 2019 (Thursday)     = 5.76 hours
November 1, 2019 (Friday)       = 5.76 hours
                                Total Weekly Hours Credited = 34.52 hours

90.    In this two-week pay-period example, Defendants paid Plaintiff the total number of only 58.82 hours, even though Plaintiff actually worked a total of 80.5 hours.

91.    In this two-week pay-period example, Defendants paid Plaintiff the hourly wage rate of $46.85 for the reduced number of work-hours, although the DOL prevailing wage rate for a Level 4 Registered Nurse (Supervisor) working in Nassau County, New York was $49.63 per hour, and although Plaintiff actually worked a total of 80.5 hours for the pay period.

92.    In this two-week pay-period example, Defendants paid Plaintiff the total gross wages of $2,755.72.

93.     In this particular two-week pay-period example, Plaintiff should have been paid the actual total work hours of 80.5 hours at the correct prevailing wage rate of $49.63, or the total correct gross wages of $3,995.21.

94.     Because Plaintiff was paid only $2,755.72 gross wages for her 80.5 actual number of work hours for this particular two-week pay-period example, her actual hourly wage rate was effectively only $34.23.

95.     Plaintiff was effectively paid less than the prevailing wage rate determined by the U.S. Department of Labor.

96.     As illustrated by the two-week pay period example above, Defendants did not pay Plaintiff any overtime pay for the week from October 27, 2019 to November 2, 2019 for all of her hours of work in excess of forty (40) hours in said week, in violation of the Employment Agreement that specifically provided that the position was a "nonexempt position" and that Plaintiff was "entitled to all applicable overtime as required by law".

97.     The same reduction of hours appeared on each and every paycheck Plaintiff received from Defendants.

98.     The purpose of reducing the number of hours reported on Plaintiff's paychecks was to make it appear that Plaintiff was receiving the prevailing wage rate or almost the prevailing wage rate as required by the Employment Agreement and the immigration laws, when she was actually being paid only about $33 per hour, or more than $10 less than the required wage.

99.     The effect of Defendants' false and fraudulent wage and hour records was to deprive Plaintiff of the wages she was entitled to be paid under both the Employment Agreement and the immigration laws. The effect was also to deprive Plaintiff of her rights under the FLSA

to be paid one and one-half times her hourly rate during workweeks when she worked more than 40 hours. By arbitrarily and unilaterally misreporting Plaintiff's work-hours through reduction of said work-hours, Defendants avoided ever recording that Plaintiff had worked more than 40 hours in any workweek.

100.    Defendants' acts of creating and maintaining false and fraudulent records of employee hours and wages demonstrated their willful contempt for the laws affecting wage and hour, including the FLSA and the NYLL.

101.    In multiple occasions in 2018, Plaintiff complained to her fellow nurse-employees that she was not being paid her promised hourly compensation rate by Defendant RN Express.

102.    Upon information and belief, Plaintiff's complaints reached the Defendants who summoned her to a meeting at their Manhattan office sometime late June or early July 2018.

103.    During this meeting with Defendants, which was attended by Defendants Nunez and Alejandrino, and the company's Human Resources Manager, Plaintiff elaborated her complaints that she was being effectively paid only about $33 per hour for her duties as a Registered Nurse Supervisor. She complained why not all of her work-hours were being reflected in her pay stubs and why was she not being paid the promised $99,088 annual compensation as stated in the Offer-Letter, or the prevailing wage rate as provided in the Employment Agreement.

104.    Defendants replied to Plaintiff that the facility to which she was assigned was paying Defendants the rate of a Registered Nurse for her position, and that Defendant RN Express would lose money if they paid her the rate of a Registered Nurse Supervisor. Defendants suggested that she transfer to another healthcare facility in New York City which would pay Defendants the rate of a Registered Nurse Supervisor position.

105.    Plaintiff initially agreed to have her worksite transferred to the New York City healthcare facility, but eventually decided to reject it due to the commute time of almost two hours one-way going to and from the facility to her residence in Nassau County, New York.

106.    Plaintiff requested Defendants to find a solution to her wage complaints even as she emphasized that she was not performing the duties of a regular staff nurse, but was performing the duties and responsibilities of a Registered Nurse Supervisor at her Amsterdam nursing home facility.

107.    Defendants Nunez and Alejandrino responded by telling Plaintiff that they hoped she would not be a problem employee who complained too much to other employees, and by reminding Plaintiff that she had a three-year contract with a liquidated damages provision that they would enforce if she left her employment. They told Plaintiff that she would be liable for the $33,320 liquidated damages if she tried to stop working or seek other employment.

108.    With Defendants' reminder of her three-year contract with a liquidated damages provision, Plaintiff felt threatened that Defendants could decide to terminate her employment for cause and demand that she pay the $33,320 amount stated in her Employment Agreement and in her Promissory Note.

109.    With Defendants' reminder of her three-year contract with a liquidated damages provision, Plaintiff felt threatened that Defendants would sue her and that she would be made to pay the $33,320 liquidated damages were she to leave her employment because of her wage and hour complaints.

110.    Plaintiff reasonably feared serious financial and reputational harm if she did not continue working for Defendants.

111.    Upon information and belief, Defendants engaged in the policy and practice of threatening to enforce the liquidated damages provisions of the other Filipino nurses' employment contracts.

112.    Upon information and belief, Defendants' threatened legal action to enforce the liquidated damages provision of the Employment Agreement and the Promissory Note was pursued for the purpose of coercing Plaintiff and other Filipino immigrant nurses to continue working for the Defendants.

113.    As a direct and proximate result of Defendants' threat to enforce the liquidated damages provision of Plaintiff's Employment Agreement, which referenced the Promissory Note, Plaintiff and other Filipino immigrant nurses were  forced to continue working for Defendants, although they were not properly paid their wages.

114.    Upon information and belief, the Defendants engaged and are engaging in a policy and practice of paying their Filipino nurse-employees less than the prevailing wages required by their employment contracts through the arbitrary deductions of their actual work-hours.

115.    Upon information and belief, the Defendants engaged and are engaging in a policy and practice of not paying their Filipino nurse-employees all their actual hours of work.

116.    Upon information and belief, the Defendants engaged and are engaging in a policy and practice of not paying their Filipino nurse-employees their overtime pay for their hours of work in excess of forty (40) hours in a given work week.

117.    The Defendants have engaged and are engaging in a deliberate scheme, pattern and plan intended to cause Plaintiff and other Filipino nurses to believe that they would suffer serious harm if they tried to leave the Defendants' employ or find other employment.

118.    The Defendants' standard employment contract provides that the Filipino nurses cannot stop working until they pay a $33,320.00 indenture disguised as "liquidated damages".

119.    The $33,320.00 indenture is designed to coerce the Filipino nurses into continuing their employment with the Defendants.

120.    The amount of $33,320.00 indenture is disproportionate to the actual costs incurred by the Defendants.

121.    In Plaintiff's case, she was required by Defendants to pay the immigration filing fee, immigration lawyer's fees, immigrant visa fee, immigration medical report fee, and her plane fare from the Philippines to New York, which should have been properly the legal and financial responsibilities of Defendant RN Express as an immigration sponsor.

122.    Upon information and belief, Defendants likewise required their other sponsored Filipino immigrant nurse-employees to pay their respective immigration filing fees, immigration lawyer's fees, immigrant visa fees, immigration medical report fees, and their own plane fare from the Philippines to come to the United States to work for Defendants.

123.    The $33,320.00 indenture is disproportionate to the compensation paid to the Filipino nurse-employees.

124.    The purpose of the $33,320.00 indenture is not to compensate Defendants for actual or potential damages.

125.    The purpose of the $33,320.00 indenture is to obtain and provide Plaintiff's and the other Filipino nurses' labor and services to Defendants and their clients.

126.    Defendants are and were able to calculate the amount of actual damages they would suffer in the event a Filipino nurse breached the employment contract.

127.    Plaintiff reasonably feared that Defendants would sue her for the $33,320.00 indenture and promissory note referred to in the employment contract.

128.    Plaintiff reasonably feared that the costs of defending herself against Defendants' threatened legal action would cause her to suffer serious harm.

129.    Upon information and belief, other Filipino nurses employed by Defendants reasonably feared that Defendants would sue them for the $33,320 indenture and promissory note referred to in their employment contracts were they to preterminate their three-year contract.

130.    Upon information and belief, other Filipino nurses employed by Defendants reasonably feared that the costs of defending themselves against Defendants' threatened legal action would cause them to suffer serious harm.

131.    The $33,320.00 indenture is part of a contract of adhesion that Defendants obtained as a result of unequal sophistication and bargaining power.

132.    Plaintiff caused the filing of this Complaint on December 9, 2019.

133.    After having caused the filing of this Complaint, Plaintiff finally found the emotional energy to notify Defendants on December 31, 2019 that she was leaving their employment on January 14, 2020.

134.    Plaintiff last worked for Defendants performing the duties and functions of a Registered Nurse Supervisor on January 14, 2020.

135.    Upon information and belief, during the class period, Defendants employed more than one hundred Filipino nurses, including the Plaintiff Baldia.

136.    During the class period, and at all times relevant herein, Plaintiff was employed by the Defendants as a Registered Nurse Supervisor routinely expected to, and in fact, did work

on a full-time basis, but was not properly compensated the correct prevailing wage rate for all of her hours of work.

137.     During the class period, and at all relevant times herein, upon information and belief, Defendants likewise employed other Filipino nurses similarly situated to and like the Plaintiff who also worked on a full-time basis, but were not properly compensated the correct prevailing wage rates for all of their hours of work relative to their position at the pertinent metropolitan statistical area of employment.

### CLASS ALLEGATIONS

138.     Plaintiff sues on her own behalf and on behalf of a class of persons under Rules 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure.

139.     Plaintiff brings her TVPA claim on behalf of all Filipino immigrant nurses who were or are employed by Defendants at any time since December 9, 2009, to the entry of judgment in this case (the "Class Period"), as hourly paid nurses at rates less than their prevailing wage rates, and have been compelled to continue performing labor or services for Defendants because of the abuse or threatened abuse of law or legal process, or because of serious harm and threats of serious harm, or because of a scheme, plan, or pattern intended to cause Plaintiff and the members of the Class to believe that, if they did not perform such labor or services, they would suffer serious harm (the "Class").

140.     Excluded from the Class are the Defendants, Defendants' legal representatives, officers, directors, assigns and successors, and/or any individual who has, or who at any time during the class period has had, a controlling interest in Defendants; the Judge(s) to whom this case is assigned and any member of the Judge's immediate family; and all persons who will submit timely and otherwise proper requests for exclusion from the Class.

141.     The claims of the Class are properly brought as a class pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure because the Defendants have acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.

142.     The claims of the class are properly brought as a class action pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure for the following reasons:

a.      Numerosity: The potential class members are so numerous that joinder of all members is impracticable.  Although the precise number of such persons is unknown, and the facts on which the calculation of that number are presently within the sole control of the Defendants, upon information and belief, there are approximately more than 100 members of the Class during the relevant Class Action Period, most of whom would not be likely to file individual suits because they lack adequate financial resources, access to attorneys, and/or knowledge of their claims, and are fearful of retaliation.

b.      Commonality: Common questions of law and fact exist as to the Class that predominate over any questions only affecting them individually, and these include, but are not limited to the following:

i.   whether Defendants engaged in a policy and practice of failing to pay Filipino nurses the prevailing wages required by their standard employment agreements for all their hours of work;

ii.   whether Defendants engaged in a policy and practice of using threats of enforcing the liquidated damages and promissory note provisions in their employment contracts by legal action to coerce Filipino nurses to continue working for them;

iii.    whether Defendants' practice and/or policy of not paying Filipino nurses the prevailing wage rates for all their hours of work was instituted willfully or with reckless disregard of the law;

iv.    whether the indenture or so-called "liquidated damages" clause and the promissory note addendum/exhibit to the employment agreements are unenforceable;

v.    whether Defendants engaged in a policy and practice of using an unenforceable indenture or contract termination penalty to coerce Filipino nurses to continue working for them;

vi.   whether the Defendants are liable to the class;

vii.    whether the Class can be made whole by the payment of damages, and;

viii.   whether Defendants Nunez and Alejandrino are personally liable for the damages sustained by class members.

c.    Typicality:  The claims of Plaintiff are typical of the claims of the Class she seeks to represent.  Plaintiff and all members of the Class are Filipino immigrant nurses. They work or have worked for Defendants as hourly-paid nurses. They enjoy the same rights to be paid wages for all hours worked at the prevailing wage rates. Plaintiff and members of the Class have all sustained similar types of damages as a result of Defendants' failure to comply with the employment contracts and of Defendants' use of threats of legal action to enforce the "liquidated damages" and promissory note provisions in their employment contracts. Plaintiff and the members of the Class have all been injured in that they have been under-compensated due to Defendants' policy,

practice and pattern of conduct of not paying the prevailing wages for all their hours of work and/or of not paying them for all of their hours of work.

d.      Adequacy of Representation: Plaintiff will fairly and adequately represent and protect the interests of the members of the Class.  Plaintiff understands that as a class representative, she assumes a fiduciary responsibility to the Class to represent its interests fairly and adequately. Plaintiff recognizes that as a class representative, she must represent and consider the interests of each Class just as she would represent and consider her own interests.  Plaintiff understands that in decisions regarding the conduct of the litigation and its possible settlement, she must not favor her own interests over the interests of the Class.  Plaintiff recognizes that any resolution of the class action must be in the best interest of the Class.  Plaintiff understands that in order to provide adequate representation, she must be informed of developments in litigation, cooperate with class counsel, and testify at deposition and/or trial.  Plaintiff has retained counsel competent and experienced in complex class actions, employment litigation and TVPA claims. There is no conflict between Plaintiff and the members of the Class.

e.      Superiority:  A class action is superior to other available methods for the fair and efficient adjudication of the controversy – particularly in the contexts of wage and hour litigation and labor trafficking litigation, where individual plaintiffs lack the financial resources to vigorously prosecute a lawsuit in federal court against corporate defendants.  In addition, class litigation is superior because it will obviate the need for unduly duplicative litigation that might result in inconsistent judgments about Defendants' practices.

143.     This action is properly maintainable as a class action under Federal Rules of Civil Procedure 23(b)(3).

**FIRST CAUSE OF ACTION**
**Violation of the Trafficking Victims Protection Act**
**18 U.S.C. § 1595**

144.     Plaintiff, on behalf of herself and the Class, re-alleges and incorporates by reference the preceding paragraphs as if fully set forth herein.

145.     Defendants knowingly provided and obtained the labor and services of Plaintiff and other members of the Class by means of the abuse or threatened abuse of law or legal process, including without limitation: the abuse of the immigration sponsorship process by fraudulently leading the Plaintiff and the members of the Class to believe that they would be employed and compensated as Registered Nurse Supervisors but were not actually employed and/or paid as such; and the use or threatened use of a law or legal process to exert pressure on Plaintiff and other members of the Class to continue working for the Defendants and to refrain from seeking employment elsewhere.

146.     Defendants knowingly provided and obtained the labor and services of Plaintiff and other members of the Class by means of serious harm and threats of serious harm to Plaintiff and other members of the Class, including without limitation, psychological, financial or reputational harm that was sufficiently serious to compel a reasonable person of the same background and in the same circumstance to perform or to continue performing labor or services in order to avoid incurring that harm.

147.     Defendants knowingly provided and obtained the labor and services of Plaintiff and other members of the Class by means of a scheme, plan, or pattern intended to cause Plaintiff and other members of the Class to believe that, if they did not perform such labor or

services, they would suffer serious harm, including without limitation, psychological, financial or reputational harm, that was sufficiently serious to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm.

148.     Defendants knowingly benefited, financially or by receiving other value, from participation in a venture which has engaged in the providing or obtaining of labor or services by the means described above, knowing or in reckless disregard of the fact that the venture has engaged in the providing or obtaining of labor or services by such means.

149.     Defendants knowingly recruited, transported, provided, and obtained Plaintiff and members of the Class for labor or services in violation of 18 U.S.C. §§ 1589, 1590, 1594(a) and 1594(b).

150.     By reason of the conduct described above, Defendants were perpetrators of violations of 18 U.S.C. §§ 1589, 1590, 1594(a) and 1594(b).

151.     Plaintiff and the other Class members suffered damages as a direct and proximate result of the Defendants' conduct.

152.     Plaintiff and the other Class members are entitled to compensatory, punitive and emotional distress damages in amounts to be determined at trial, together with reasonable attorney's fees and the costs of this action.

**SECOND CAUSE OF ACTION**
**Violation of the Trafficking Victims Protection Act**
**18 U.S.C. § 1594(b)**

153.     Plaintiff, on behalf of herself and the Class, re-alleges and incorporates by reference the preceding paragraphs as if fully set forth herein.

154.     Defendants conspired with one another to violate 18 U.S.C. §§ 1589 and 1590.

155.    Defendants agreed to provide and obtain the labor and services of Plaintiff and other members of the Class by means of the abuse or threatened abuse of law or legal process, including without limitation: the abuse of the immigration sponsorship process by fraudulently leading the Plaintiff and the members of the Class to believe that they would be employed and compensated as Registered Nurse Supervisors but were not actually employed and/or paid as such; and, the use or threatened use of a law or legal process to exert pressure on Plaintiff and other members of the Class to continue working for the Defendants and to refrain from seeking employment elsewhere.

156.    Defendants agreed to provide and obtain the labor and services of Plaintiff and other members of the Class by means of serious harm and threats of serious harm to Plaintiff and other members of the Class, including without limitation, psychological, financial or reputational harm that was sufficiently serious to compel a reasonable person of the same background and in the same circumstance to perform or to continue performing labor or services in order to avoid incurring that harm.

157.    Defendants agreed to provide and obtain the labor and services of Plaintiff and other members of the Class by means of a scheme, plan, or pattern intended to cause Plaintiff and other members of the Class to believe that, if they did not perform such labor or services, they would suffer serious harm, including without limitation, psychological, financial or reputational harm, that was sufficiently serious to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm.

158.    Defendants agreed to benefit, financially or by receiving other value, from participation in a venture which has engaged in the providing or obtaining of labor or services by

the means described above, knowing or in reckless disregard of the fact that the venture has engaged in the providing or obtaining of labor or services by such means.

159.    Defendants agreed to recruit, transport, provide, and obtain Plaintiff and members of the Class for labor or services in violation of 18 U.S.C. §§ 1589 and 1590.

160.    Each of the Defendants engaged in at least one overt act in furtherance of the conspiracy, including:

    a)    Defendant RN Express recruited Plaintiff and other Class members in the Philippines to work for the Defendants in the United States, and after their arrival in the United States, warned them of the serious harm they would suffer if they attempted to stop working for the Defendants or to seek employment elsewhere.

    b)    Defendant RN Express failed to pay Plaintiff and other Class members the prevailing wage rates under their employment contracts for all of their work hours.

    c)    Defendant Nunez went to the Philippines and recruited Plaintiff and other Class members to be sponsored and employed by the Defendants.

    d)    Defendant Alejandrino signed either immigration sponsorship forms or confirmation of offers of employment to Plaintiff or to other Class members who were made to perform and render nursing services.

    e)    Each of Defendants Nunez and Alejandrino obtained the services of Plaintiff and other Class members knowing of the employees' "liquidated damages" provisions in their contracts.

161.    Each of the Defendants intentionally engaged in these acts and additional acts in furtherance of their agreed plan to deny Plaintiff and other members of the Class the compensation they were entitled under their employment agreements and to coerce Plaintiff and other Class members to continue working for the Defendants and not to seek employment elsewhere.

162.    Plaintiff and the other Class members suffered damages as a direct and proximate result of the Defendants' conspiracy.

163.    Plaintiff and the other Class members are entitled to compensatory, punitive and emotional distress damages in amounts to be determined at trial, together with reasonable attorney's fees and the costs of this action.

## THIRD CAUSE OF ACTION
### Violations of the Minimum and Overtime Wage Provisions of the FLSA
### 29 U.S.C. §§ 201 *et seq.*

164.    Plaintiff, on behalf of herself and the Class, re-alleges and incorporates by reference the preceding paragraphs as if fully set forth herein.

165.    Defendants have engaged in a widespread pattern, policy and practice of violating the FLSA, as detailed in this Complaint.

166.    At all times relevant, Plaintiff and the members of the Class were employed by Defendants who were engaged in commerce and/or the production or sale of goods for commerce within the meaning of 29 U.S.C. §§ 201 *et seq.*

167.    At all times relevant, Plaintiff and the members of the Class were or have been employees within the meaning of 29 U.S.C. §§ 201 *et seq.*

168.    At all times relevant, Defendants have been employers of Plaintiff and the members of the Class, engaged in commerce and/or the production of goods for commerce within the meaning of 29 U.S.C. §§ 201 *et seq.*

169.    As such, Plaintiff and the members of the Class are entitled to protection under the FLSA's minimum and overtime wage provisions.

170.    Defendants failed to pay Plaintiff and the members of the Class at the applicable minimum hourly rate, in violation of 29 U.S.C. § 206(a), for all of their hours of work.

171.    The overtime wage provisions set forth in the FLSA, 29 U.S.C. §§ 201 *et seq.*, and the supporting federal regulations, apply to Defendants and protect the Plaintiff and the members of the Class.

172.    Defendants failed to pay Plaintiff and the members of the Class the premium overtime wages to which they were each entitled under the FLSA for all hours worked beyond forty (40) per workweek.

173.    Defendants' failure to pay Plaintiff and the members of the Class at the applicable minimum hourly rate and/or the proper overtime premium pay was willful within the meaning of 29 U.S.C. § 255(a). Defendants were aware or should have been aware that the practices described in this Complaint were unlawful.  Defendants have not made a good faith effort to comply with the FLSA with respect to the compensation of the Plaintiff and the members of the Class.

174.    As a result of Defendants' willful violations of the FLSA, Plaintiff and the members of the Class suffered and have suffered damages by being denied minimum wage compensation in an amount to be determined at trial, and/or by being denied premium overtime pay in an amount to be determined at trial, and are entitled to recovery of such amounts,

liquidated damages, prejudgment interest, attorney's fees, costs, and other compensation pursuant to 29 U.S.C. §§ 201 *et seq.*

## FOURTH CAUSE OF ACTION
### New York Labor Law (NYLL)

175.   Plaintiff, on behalf of herself and the Class, re-alleges and incorporates by reference the preceding paragraphs as if fully set forth herein.

176.   At all relevant times, Plaintiff and the members of the Class, have been employees of the Defendants, and the Defendants have been their employers within the meaning of the New York Labor Law, §§2 and 651.

177.   Defendants failed and have failed to pay the Plaintiff and the members of the Class compensation for all their hours of work, in violation of NYLL Article 19, §§650 *et seq.* and the supporting New York State Department of Labor regulations, including at least minimum wages for the hours that were not paid, and also premium overtime pay for all hours of work in excess of forty (40) hours per work-week.

178.   Defendants violated Plaintiff's rights and the rights of the members of the Class, by failing to pay them for all of the hours actually worked by them.  Defendants' violations of the NYLL have been willful and intentional.

179.   Defendants' violations of the NYLL have caused Plaintiff and the members of the Class irreparable harm and injury.

180.   Due to Defendants' NYLL violations, Plaintiff and the members of the Class are entitled to recover from Defendants their unpaid wages, liquidated damages, as well as reasonable attorney's fees, and costs and disbursement of the action.

## FIFTH CAUSE OF ACTION
### Breach of Contract

181.    Plaintiff, on behalf of herself and the Class, re-alleges and incorporates by reference the preceding paragraphs as if fully set forth herein.

182.    Plaintiff and the other Class members each entered into a valid and binding employment contract with Defendant RN Express.

183.    Plaintiff and the other Class members substantially performed under the contracts.

184.    Defendants RN Express, Nunez and Alejandrino breached the contracts by failing to immediately provide Plaintiff and the other Class members employment after Plaintiff and the other Class members had presented themselves for employment.

185.    Defendants RN Express, Nunez, and Alejandrino breached the contracts by failing to provide Plaintiff and the other Class members the promised position of Registered Nurse Supervisor.

186.    Defendants RN Express, Nunez, and Alejandrino breached the contracts by failing to pay Plaintiff and the other Class members the correct prevailing wage rate for the position actually performed by the Plaintiff and the other Class members, which was that of a Registered Nurse Supervisor position.

187.    Defendants RN Express, Nunez, and Alejandrino breached the contracts by arbitrarily reducing or deducting work-hours from Plaintiff's and other Class members' actual hours of work, and by not paying them for all of their work-hours.

188.    Defendants RN Express, Nunez, and Alejandrino breached the contracts by failing to pay Plaintiff and other Class members their premium overtime pay for all of their hours of work in excess of forty (40) hours per work-week.

189.    Plaintiff and the other Class members suffered damages as a direct and proximate result of the breach.

190.    Plaintiff and the other Class members are entitled to compensatory damages for breach of contract in amounts to be determined at trial.

## FOURTH CAUSE OF ACTION
### Action for Declaratory Judgment

191.    Plaintiff, on behalf of herself and the members of the Class, re-alleges and incorporates by reference the preceding paragraphs as if fully set forth herein.

192.    Defendants' threats to enforce the so-called "liquidated damages" clause and the promissory note addendum/exhibit of the employment contracts constitute threats of serious harm within the meaning of the Trafficking Victims Protection Act.

193.    Plaintiff and members of the Class have been compelled to perform and to continue performing labor or services for Defendant RN Express in order to avoid incurring that harm.

194.    Defendant RN Express's threats to commence legal action against Plaintiff and members of the Class to enforce the penalty and promissory note provisions of the employment contracts are designed to cause them to continue working for the Defendants and refrain from leaving their employment, notwithstanding their failure to pay Plaintiff and members of the Class the legally required and/or contracted compensation.

195.    Plaintiff and members of the Class have been compelled to perform and to continue performing labor or services for Defendant RN Express as a result of its threats.

196.    The 13th Amendment to the United States Constitution provides that involuntary servitude shall not exist within the United States or any place subject to their jurisdiction.

197.    The so-called "liquidated damages" clause and the promissory note addendum/exhibit in the employment contracts are intended to keep Plaintiff and members of the Class in a position of involuntary servitude.

198.   The so-called "liquidated damages" clause and the promissory note addendum/exhibit in the employment contracts have the effect of keeping Plaintiff and members of the Class in a position of involuntary servitude.

199.   A Court may not use its legal authority and power to enforce so-called "liquidated damages" clauses and the promissory note addendum/exhibit in an employment contract that have the purpose and effect of keeping Plaintiff and members of the Class in a position of involuntary servitude.

200.   The so-called "liquidated damages" clause and the promissory note addendum/exhibit in the employment contracts are an unenforceable penalty.

201.   The amount of the so-called "liquidated damages" is disproportionate to Defendant RN Express's actual or probable losses.

202.   Defendant RN Express's actual damages caused by a breach of the employment contracts are and were readily ascertainable.

203.   The amount of the so-called "liquidated damages" is disproportionate to the compensation of Plaintiff and other Class members.

204.   The purpose and effect of the so-called "liquidated damages" clause is to coerce Plaintiff and other Class members into continuing to work for Defendant RN Express.

205.   The so-called "liquidated damages" clause was the result of unequal bargaining power and a contract of adhesion.

206.   Plaintiff and members of the Class have a definite and concrete dispute with Defendant RN Express concerning the enforceability of the so-called "liquidated damages" clause and the promissory note addendum/exhibit in the employment contracts.

207.   The dispute touches the legal relations of parties having adverse legal interests.

208.    The dispute is real and substantial.

209.    The dispute admits of specific relief through a decree of a conclusive character.

210.    The dispute involves a substantial controversy of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

211.    Defendant RN Express's threats to enforce the liquidated damages and the promissory note addendum/exhibit would work to Plaintiff's detriment and injury, and for which she has no adequate remedy at law.

212.    For the above reasons, the liquidated damages and the promissory note addendum/exhibit in the employment agreements are void and unenforceable and in contravention of the laws of the State of New York, in that these are a restraint of trade, against public policy, and constitute an unlawful coercive device designed to depress wages and would effectively compel someone to continue working.

213.    Plaintiff's services as a licensed Nurse are not unique or extraordinary, nor are they of a character that involves the acquisition of any trade secrets of Defendants.  Plaintiff's skills, ability and knowledge obtained in the course of her employment are not the property of Defendants.

214.    The liquidated damages and the promissory note addendum/exhibit contained in the employment agreements are not reasonably necessary to protect any legitimate business interests of the Defendants, and are therefore unenforceable and contrary to public policy as an unnecessary restrain of employment.

215.    The employment agreements containing the $33,320.00 liquidated damages provision are harsh, oppressive, inequitable and unenforceable.  These are adhesive contracts frowned upon in law.

216.     The liquidated damages provisions of the employment contracts are actually a penalty.  While the provision fixed the damages in the event of a breach, the amount liquidated, which is $33,320.00, did not bear a reasonable proportion to the probable loss.  $33,320.00 is grossly disproportionate to the amount of probable loss by the Defendant RN Express.

217.     As a direct and proximate result of Defendant RN Express's threats to enforce the liquidated damages and the promissory note addendum/exhibit by legal action, Plaintiff has suffered and will continue to suffer in the future, direct and consequential damages, including but not limited to, the loss of the ability to exercise her rights to leave her employment for good cause, and to exercise her nursing profession in another environment free of concerns or issues that would jeopardize her nursing license, her health, and the delivery of quality patient care to the patients.

218.     By reason of the foregoing, an actual and justiciable controversy exists between Plaintiff and the members of the Class, on one hand, and Defendant RN Express, on the other hand. Plaintiff seeks a declaratory judgment that the liquidated damages and the promissory note addendum/exhibit in the employment agreements are void and unenforceable.

## **PRAYER**

**WHEREFORE,** Plaintiff, on behalf of herself and all other similarly-situated members, respectfully requests that this Court grant the following relief:

(a)     Against all Defendants, jointly and severally, awarding Plaintiff and members of the Class compensatory, punitive and emotional distress damages for violations of the Trafficking Victims Protection Act;

(b)     Against all Defendants, jointly and severally, awarding Plaintiff and members of the Class compensatory and liquidated damages for failure to pay the correct prevailing wage

rates and overtime pay, and for failure to pay all of their employees' hours of work, in violation of the Fair Labor Standards Act and the New York Labor Law, and for breach of contract;

(c)      Against Defendant RN Express, declaring that the so-called "liquidated damages" and the promissory note addendum/exhibit in the employment contracts are unenforceable under the Trafficking Victims Protection Act, 18 U.S.C. § 1589, *et seq.*, the 13th Amendment to the United States Constitution, and New York law; and enjoining Defendant RN Express from enforcing or threatening to enforce the so-called "liquidated damages" and the promissory note addendum/exhibit in the employment contracts against Plaintiff or any other class member in any forum;

(d)      An award of prejudgment and post-judgment interests;

(e)      An award of costs and expenses of this action, together with reasonable attorneys' fees;

(f)      Such other and further relief as this Court deems just and proper.

Respectfully submitted.
July 1, 2020. Woodside, New York.

Yours, etc.

LAW OFFICE OF FELIX VINLUAN          JUDE TADEO PALCES LAW

By:                                  By:

FELIX VINLUAN (FV6788)               JUDE T. PALCES (JP4763)
69-10 Roosevelt Avenue, 2nd Fl.    535 Lakeville Road
Woodside, NY 11377                   New Hyde Park, NY 11040
Tel. No. 718-478-4488                Tel. No. 917-816-0482
Fax No. 718-478-4588                 Email: jtpalces@gmail.com
Email: fqvinluan@yahoo.com

*Attorneys for the Plaintiff*

40

## VERIFICATION

STATE OF TEXAS      )
COUNTY OF HARRIS    ) S.S.

      I, MARIE ALEXANDRINE BALDIA, also known as MARIE ALEXANDRINE NADELA, of legal age, and presently residing in Harris County, state of Texas, after having been sworn in accordance with law, hereby state that I am the Plaintiff in the within Amended Complaint. I have read the foregoing Amended Complaint and know the contents thereof. The contents are true to my knowledge, except as to matters therein stated to be alleged upon information and belief, and as to those matters, I believe them to be true.

                                    **MARIE ALEXANDRINE BALDIA a/k/a**
                                    **MARIE ALEXANDRINE NADELA**

SUBSCRIBED AND SWORN to before me this 2nd day of July 2020.

Notary Public