UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MARIE ALEXANDRINE BALDIA, a/k/a
MARIE ALEXANDRINE NADELA, on
behalf of herself and all others similarly
situated,

                          Plaintiff,

            v.

RN EXPRESS STAFFING REGISTRY
LLC, SALLY NUNEZ, and ALEXANDER
ALEJANDRINO,

                          Defendants.

**MEMORANDUM**
**OPINION & ORDER**

19 Civ. 11268 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

   Plaintiff Marie Alexandrine Baldia brings this putative class action against

Defendants RN Express Staffing Registry LLC ("RN Express"), Sally Nunez, and Alexander

Alejandrino for violations of the Trafficking Victims Protection Act (the "TVPA"), the overtime

and minimum wage provisions of the Fair Labor Standards Act (the "FLSA") and the New York

Labor Law (the "NYLL").  The Amended Complaint also seeks a declaratory judgment and

asserts a claim for breach of contract.  (See Am. Cmplt. (Dkt. No. 27))

   Defendants have moved to dismiss the Amended Complaint pursuant to Fed. R.

Civ. P. 12(b)(6).  (Dkt. No. 32)  In a September 30, 2022 Order, this Court granted Defendants'

motion as to Plaintiff's minimum wage claims under the FLSA and the NYLL, but otherwise

denied the motion.  The purpose of this memorandum opinion and order is to explain the Court's

reasoning.

<u>**BACKGROUND**</u>[1]

I.   <u>**FACTS**</u>

The Amended Complaint alleges that over the past ten years Defendant RN Express has recruited more than 100 Filipino nurses to work in New York under a "standard Employment Agreement."  (Am. Cmplt. (Dkt. No. 27) ¶¶ 4, 13, 33)  At all relevant times, Defendant Nunez served as RN Express's Chief Executive Offer and Defendant Alejandrino served as its "Administrator."  (<u>Id.</u>  ¶¶ 15-16)

Plaintiff Baldia is a citizen of the Philippines who, beginning in February 2016, was recruited by Nunez and Alejandrino to work as a registered nurse supervisor ("RNS") for RN Express in the United States.  (<u>Id.</u> ¶¶ 11, 34)  Later in 2016, Baldia accepted Defendants' offer of a position as "Registered Nurse Supervisor with compensation pursuant to prevailing wage law."  (<u>Id.</u> ¶¶ 34-36)  Defendants filed a Form I-140 immigration petition (the "Petition") on behalf of Baldia with the United States Citizenship and Immigration Services ("USCIS") on April 15, 2016.[2]  (<u>Id.</u> ¶ 36)  As Baldia's petitioning employer, Defendants signed a Form ETA 9089 promising USCIS that they would pay Plaintiff at least the prevailing wage rate for the position of Registered Nurse Supervisor in her area of employment.  (<u>Id.</u> ¶¶ 37-38)  In May 2016, USCIS approved the Petition, and USCIS scheduled Baldia for a visa interview at the U.S. Embassy in Manila on May 18, 2018.  (<u>Id.</u> ¶¶ 43-44)

---

[1]  The following facts are drawn from the Amended Complaint and are presumed true for purposes of resolving Defendants' motion to dismiss.  <u>See</u> <u>Kassner v. 2nd Ave. Delicatessen, Inc.</u>, 496 F.3d 229, 237 (2d Cir. 2007).  On a motion to dismiss, courts also draw all reasonable inferences in a plaintiff's favor.  <u>Melendez v. City of New York</u>, 16 F.4th 992, 1010 (2d Cir. 2021).

[2]  Defendant sponsored Baldia as an EB-2 immigrant worker.  That designation signifies that the immigrant has been offered a supervisory position that requires at least a master's degree in nursing, or a bachelor's degree in nursing with five years of relevant experience.  (<u>Id.</u> ¶ 41)

On May 8, 2018, Defendants sent Baldia an offer letter, as well as a standard form employment agreement and promissory note.  (Id. ¶¶ 45, 47)  Defendants informed Baldia that she was required to sign the employment agreement and the promissory note.  (Id. ¶ 45)  The offer letter – dated May 3, 2018, and addressed to the U.S. Embassy in Manila – states, in part: "This letter is to confirm that Marie Alexandrine R. Baldia is offered employment on [a] full time basis as a Nurse Supervisor with [an] annual salary of $99,008.00."  (May 3, 2018 Ltr. (Dkt. No. 34-2))  The letter also sets forth Baldia's duties as an RNS.  (Id.)

On May 17, 2018, Baldia signed the "standard employment agreement" (the "Employment Agreement"), which also bears Defendant Alejandrino's signature on behalf of RN Express.  (Am. Cmplt. (Dkt. No. 27) ¶¶ 51, 55; Employment Agmt. (Dkt. No. 34-1) at 12)[3] The Employment Agreement states:  "[T]he Company will employ Healthcare Professional as an RNS under the direction of the President of the Company or her designee" "for a three (3) year period (the 'Employment Term')."  (Employment Agmt. (Dkt. No. 34-1) ¶ 4)

As to compensation, the Employment Agreement states that

> [t]his is a nonexempt position . . . . In consideration of Healthcare Professional's Services, on a bi-weekly basis, Healthcare Professional will be paid the higher of [] the prevailing wage for the occupation as determined by the U.S. Department of Labor for the particular Facility to which Healthcare Professional is assigned, less applicable withholdings and deductions.  Healthcare Professional is entitled to all applicable overtime as required by law.

(Id. ¶ 7)

The Employment Agreement also addresses RN Express's recovery of its "Recruitment Costs," and includes a liquidated damages provision that would apply if Baldia

---

[3]  The page numbers of documents referenced in this Order correspond to the page numbers designated by this District's Electronic Case Files ("ECF") system.

terminated her employment "without cause" "prior to [the] expiration of [her three-year] employment term."  These provisions provide as follows:

(a) Healthcare Professional acknowledges that the Company will incur significant costs in the recruiting, training, and placement of Healthcare Professional; the provision of relocation/start-up assistance to Healthcare Professional; and the provision of assistance to help Healthcare Professional meet the conditions set forth in Section 2 of this Agreement; and will incur other costs in relation to this Agreement.  While not discernible at this time, it is anticipated that the costs referenced in the foregoing sentence will equal or exceed Thirty-three Thousand, Three Hundred Twenty Dollars ($33,320.00) [and] such amount shall be referred to as the "Company Recruitment Costs."

(b) On the first day of each month after Healthcare Professional's completion of the first full year of the Employment Term, an amount equal to 1/24 of the Company Recruitment Costs[4] (the "Monthly Reduction Amount") shall be deducted from the Company Recruitment Costs.

(c) In the event that Healthcare Professional terminates the Employment Agreement without Cause and does not complete the Employment Term . . . , the Company Recruitment Costs minus any applicable Monthly Reduction Amounts as of the date thereof (the "Net Recruitment Costs") shall become due and payable by Healthcare Professional to the Company as liquidated damages in accordance with the Promissory Note.

(Employment Agmt. (Dkt. No. 34-1) ¶ 10)

Defendants also prepared – and required Baldia to sign – a promissory note in which Baldia promised to pay RN Express $33,320 for value received "in the event that [she] terminates the Employment Agreement without cause and does not complete the employment term."  (Am. Cmplt. (Dkt. No. 27) ¶ 53)  Baldia sent executed copies of the Employment Agreement and promissory note to Defendants.  (Id. ¶ 55)  Defendants instructed Baldia to present the offer letter at her visa interview, but that the promissory note "should not be presented."  (Id. ¶¶ 45, 56)

---

[4] While the Employment Agreement refers to the "Company['s] Recruitment Costs," Baldia paid the immigration filing fee, the immigration lawyer's fees, the immigration medical report fee, and her plane fare from the Philippines to New York.  (Am. Cmplt. (Dkt. No. 27) ¶ 121)

On August 2, 2018, Baldia received an immigrant visa from the U.S. Embassy to work as an RNS in the United States.  (Id. ¶ 61)

Baldia entered the United States on September 27, 2018, and appeared for work at RN Express on October 9, 2018.  (Id. ¶¶ 63-64)  Defendants did not immediately assign Baldia to a facility, however.  Baldia was instead instructed to attend an orientation on October 15, 2018, in which RN Express's human resources manager explained to Baldia that if she did not complete her Employment Term, Defendants would enforce the Employment Agreement's liquidated damages provision and she would owe RN Express $33,320 by way of the promissory note.  (Id. ¶¶ 68-69)

Throughout Baldia's employment at RN Express, Defendants Alejandrino and Nunez determined Baldia's place of employment, controlled her work schedule, and supervised her work.  (Id. ¶ 22)

On October 21, 2018, Defendants assigned Baldia to work as a registered nurse at Amsterdam Harbor Side Nursing Home in Port Washington, New York.  (Id. ¶¶ 71, 73) Although her title was registered nurse, Baldia "performed the duties and responsibilities" of an RNS, as described in the May 3, 2018 offer letter.  (Id. ¶ 75; see May 3, 2018 Ltr. (Dkt. No. 34-2))

On November 6, 2018, Defendants issued Baldia a Pay Rate Notice – signed by Alejandrino – that includes handwritten notes stating, "actual rate = $33/hr" and "Paycom rate = $40/hr."  (Am. Cmplt. (Dkt. No. 27) ¶ 76)  Confused by these notes, Baldia approached Defendant Alejandrino for an explanation.  Alejandrino told Baldia that the $33 hourly rate was only temporary, and that Baldia would eventually be compensated at the offered prevailing wage rate.  (Id. ¶¶ 77-79)  Throughout Baldia's employment at RN Express, however, Defendants paid

her at an hourly rate of $33 to $34 per hour, well below the "prevailing wage rate" for an RNS under U.S. Department of Labor regulations.[5]  (Id. ¶¶ 76-77, 81, 84, 134)

Moreover, in Baldia's "Web Time Sheets," Defendants arbitrarily reduced the number of hours Baldia had actually worked.  (Id. ¶ 86)  For example, for the week between October 20, 2019, and October 26, 2019, Baldia worked 34.5 hours, but her time sheets showed that she had worked only 24.3 hours.  In the following week, Baldia worked 46 hours, but her time sheets reflected that she had only worked 34.52 hours.  (Id. ¶¶ 87-89)  During this two-week pay period, RN Express paid Baldia total gross wages of $2,755.72.  (Id. ¶ 92)

According to Baldia, "the same reduction of hours appeared on each and every paycheck [she] received from Defendants."  (Id. ¶ 97)  Baldia asserts that the purpose of these reductions was to make it appear that she was being paid at or about the prevailing wage rate – as set forth in the Employment Agreement and the Petition – when she was actually being paid at a much lower rate.  (Id. ¶ 98)

Baldia complained to her fellow employees that RN Express was not paying her at the "prevailing wage rate" that she had been promised.  (Id. ¶ 101)  Her complaints ultimately came to the attention of Alejandrino and Nunez, who summoned Baldia to their Manhattan offices in late June or early July 2019 for a meeting.[6]  (Id. ¶ 102)  At that meeting, which was

---

[5]  The Amended Complaint alleges that – for the period between October 2018 and June 30, 2019 – the U.S. Department of Labor wage rate for a Level 4 Registered Nurse working in Nassau County, New York, where Port Washington is located, was $48.68 per hour.  (Id. ¶ 82)  That prevailing wage rate rose to $49.63 per hour for the period between July 1, 2019 and January 14, 2020, when Baldia left RN Express.  (Id. ¶¶ 83, 134)

[6]  The Court assumes that the Amended Complaint's reference to "late June or early July 2018" is a typographical error, because Baldia did not arrive in the United States until September 27, 2018.  (Am. Cmplt. (Dkt. No. 27) ¶ 63; see Def. Br. (Dkt. No. 33) at 16 n.11; Pltf. Opp. (Dkt. No. 35) at 16 n.2)  Moreover, the offer letter and the Employment Agreement are dated May 3, 2018, and appear to have been signed by Alejandrino on May 8, 2018.  (Employment Agmt. (Dkt. No. 34-1) at 1, 11; May 3, 2018 Offer Ltr. (Dkt. No. 34-2))

also attended by RN Express's human resources manager, Baldia reiterated her complaints concerning her hourly rate, citing the $99,088 annual compensation promised in her offer letter and the prevailing wage rate referenced in the Employment Agreement.  Baldia also pointed out that her pay stubs did not accurately report the number of hours she had worked.  (Id. ¶ 103)

Alejandrino and Nunez explained that Baldia was being paid at the rate of a registered nurse, and that RN Express would lose money if it paid her at the rate of an RNS. Defendants also offered to permit Baldia to transfer to a healthcare facility in New York City, where she could work as an RNS and earn a higher wage rate.  (Id. ¶¶ 104)  Baldia initially accepted the transfer, but changed her mind as a result of the nearly two-hour commute to the facility from her Nassau County residence.  (Id. ¶ 105)  Baldia then again requested that RN Express address her wage complaints, emphasizing that she performed the duties of an RNS at the Amsterdam facility, yet was only paid the rate of a registered nurse.  (Id. ¶ 106)

Nunez and Alejandrino responded that "they hoped [Baldia] would not be a problem employee who complained too much to other employees."  They also told Baldia that they would enforce the Employment Agreement's liquidated damages provision if she did not complete her three-year term, and that Baldia would be liable for the $33,320 in liquidated damages if she left RN Express before her term ended or she sought alternative employment. (Id. ¶ 107)

Baldia understood from these statements that Defendants were threatening to take legal action against her to enforce the $33,320 liquidated damages provision.  Baldia feared the costs of defending herself against Defendants' threatened legal action, and that she would incur serious financial and reputational harm if she did not continue working for Defendants.  (Id. ¶¶

110, 127-28)  As a result, Baldia continued working for RN Express until January 14, 2020.  (Id. ¶ 134)

Baldia alleges that Alejandrino and Nunez – in threatening to take legal action to enforce the liquidated damages provision – were coercing her to continue working at RN Express.  Defendants threatened that Baldia would suffer serious psychological, financial, and reputational harm if she did not continue working for Defendants.  (Id., e.g., ¶¶ 112, 147)

The Complaint was filed on December 9, 2019 (Dkt. No. 1), and Baldia notified RN Express on December 31, 2019, that she would leave her employment at the Company on January 14, 2020.  (Id. ¶ 133-34)

The Amended Complaint was filed on July 2, 2020.  (Dkt. No. 27)  Defendants moved to dismiss the Amended Complaint on September 25, 2020.  (Dkt. No. 32)

## DISCUSSION

### I.  MOTION TO DISMISS STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  "In considering a motion to dismiss . . . the court is to accept as true all facts alleged in the complaint," Kassner, 496 F.3d at 237 (citing Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals, 282 F.3d 83, 87 (2d Cir. 2002)), and must "draw all reasonable inferences in favor of the plaintiff."  Id. (citing Fernandez v. Chertoff, 471 F.3d 45, 51 (2d Cir. 2006)).

Under this standard, a plaintiff is required only to set forth a "short and plain statement of the claim," Fed. R. Civ. P. 8(a), with sufficient factual "heft 'to sho[w] that the pleader is entitled to relief.'"  Twombly, 550 U.S. at 557 (quoting Fed. R. Civ. P. 8(a)).  To

survive a motion to dismiss, plaintiff's "[f]actual allegations must be enough to raise a right of

relief above the speculative level," id. at 555, and plaintiff's claims must be "plausible on [their]

face." Id. at 570.  "The plausibility standard is not akin to a 'probability requirement,' but it asks

for more than a sheer possibility that a defendant has acted unlawfully."  Iqbal, 556 U.S. at 678.

"Where a complaint pleads facts that are 'merely consistent with' a defendant's

liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'"

Id. (quoting Twombly, 550 U.S. at 557).  Moreover, where "the allegations in a complaint,

however true, could not raise a claim of entitlement to relief," Twombly, 550 U.S. at 558, or

where a plaintiff has "not nudged [his] claims across the line from conceivable to plausible, the[]

complaint must be dismissed."  Id. at 570.  "Nor does a complaint suffice if it tenders 'naked

assertion[s]' devoid of 'further factual enhancement.'"  Iqbal, 556 U.S. at 678 (quoting

Twombly, 550 U.S. at 557).

"In considering a motion to dismiss for failure to state a claim pursuant to Rule

12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to

the complaint as exhibits, and documents incorporated by reference in the complaint."  DiFolco

v. MSNBC Cable L.L.C., 622 F.3d 104, 111 (2d Cir. 2010) (citing Chambers v. Time Warner,

Inc., 282 F.3d 147, 153 (2d Cir. 2002); Hayden v. Cty. of Nassau, 180 F.3d 42, 54 (2d Cir.

1999)).

## II.   TRAFFICKING VICTIMS PROTECTION ACT CLAIMS

18 U.S.C. § 1595(a) provides a private right of action to "an[y] individual who is

a victim of a violation of [the TVPA]."  See 18 U.S.C. § 1595(a).  Here, Baldia alleges (1) forced

labor violations under 18 U.S.C. § 1589; (2) "trafficking" with respect to forced labor under 18

U.S.C. § 1590; and (3) conspiracy and attempt to violate the TVPA under 18 U.S.C. §§ 1594(a)-
(b).[7]  (Am. Cmplt. (Dkt. No. 27) ¶¶ 149-150, 154, 159)

   Defendants contend that the Amended Complaint does not state a TVPA claim
under Rule 12(b)(6).  (Def. Br. (Dkt. No. 33) at 12-22)  Because 18 U.S.C. §§ 1589, 1590, and
1594 provide distinct bases for liability, this Court addresses them separately below.

### A.  Forced Labor Claims under 18 U.S.C. § 1589

   18 U.S.C. § 1589 provides as follows:

(a) Whoever knowingly provides or obtains the labor or services of a person by
any one of, or by any combination of, the following means –

  (1) by means of force, threats of force, physical restraint, or threats of
physical restraint to that person or another person;

  (2) by means of serious harm or threats of serious harm to that person or
another person;

  (3) by means of the abuse or threatened abuse of law or legal process; or

  (4) by means of any scheme, plan, or pattern intended to cause the person
to believe that, if that person did not perform such labor or services,
that person or another person would suffer serious harm or physical
restraint,

shall be punished as provided under subsection (d).

18 U.S.C. § 1589(a).

   "Section 1589 was intended to broaden the punishable conduct under the [TVPA]
beyond [what] constitutes involuntary servitude."  Akhtar v. Vitamin Herbal Homeopathic Ctr.
Inc., No. 19-CV-1422 (WFK), 2021 WL 7186030, at *6 (E.D.N.Y. Apr. 30, 2021) (citing Walia

---

[7] Baldia asserts violations of 18 U.S.C. §§ 1589, 1590, and 1594 in the "First Cause of Action"
(see Am. Cmplt. (Dkt. No. 27) ¶ 150), but restates the conspiracy claim under § 1594(b) in the
"Second Cause of Action."  (Id. ¶¶ 153-63)  The First Cause of Action is brought under 18
U.S.C. § 1595, but that provision only provides a private right of action regarding substantive
violations of the TVPA.  See 18 U.S.C. § 1595.

v. Veritas Healthcare Sols., L.L.C., 13-CV-6935 (KPF), 2015 WL 4743542, at *4 (S.D.N.Y. Aug. 11, 2015)).  "[T]he fundamental purpose of § 1589 is to reach cases of servitude achieved through nonviolent coercion – namely serious harm, the threat of serious harm, or the abuse or threatened abuse of legal process."  Paguirigan v. Prompt Nursing Emp. Agency LLC, 286 F. Supp. 3d 430, 439 (E.D.N.Y. 2017) (citing 18 U.S.C. § 1589(a); Franco v. Diaz, 51 F. Supp. 3d 235, 247 (E.D.N.Y. 2014)).

The Amended Complaint refers to the second, third, and fourth subsections of 18 U.S.C. § 1589(a).  (Am. Cmplt. (Dkt. No. 27) ¶¶ 145-47)  The Court addresses Baldia's claims under each subsection below.

### 1.    Serious Harm under § 1589(a)(2)

Baldia contends that the Employment Agreement's liquidated damages provision, and the individual Defendants' threat to enforce it, constitutes "serious harm" under § 1589(a)(2).  (Id. ¶¶ 125, 127-28, 146; Pltf. Opp. (Dkt. No. 35) at 17-19)  Defendants contend that none of their alleged conduct "constitutes a threat of any kind – and certainly not the kind of threat recognized to coerce continued employment under the TVPA."  (Def. Br. (Dkt. No. 33) at 16)  Baldia counters that Defendants' "statement that they would enforce the 3-year employment contract with a liquidated damages provision was a coercive threat of serious harm cognizable by the TVPA."  (Pltf. Opp. (Dkt. No. 35) at 17)

Baldia further maintains that the $33,320 liquidated damages provision is an unenforceable penalty under New York law (id. at 29-30; see also Am. Cmplt. (Dkt. No. 27) ¶¶ 200, 214), while Defendants argue that this provision is enforceable.  (Def. Br. (Dkt. No. 33) at 29-30; Def. Reply (Dkt. No. 36) at 14)

a.   **Applicable Law**

For purposes of § 1589(a)(2),

> [t]he term 'serious harm' means any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm.

18 U.S.C. § 1589(c)(2).  "When considering whether an employer's conduct was sufficiently serious to coerce the victim to provide labor or services against her will, the Court must also 'consider the particular vulnerabilities of a person in the victim's position.'"  Akhtar, 2021 WL 7186030, at *7 (quoting United States v. Rivera, 799 F.3d 180, 186 (2d Cir. 2015)).  "'The correct standard is a hybrid' [and] requires [that the] victim's 'acquiescence be objectively reasonable under the circumstances.'"  Id. (quoting Rivera, 799 F.3d at 186-87).

"The threat of financial harm constitutes serious harm within the meaning of the TVPA."  Paguirigan, 286 F. Supp. at 438 (citing United States v. Dann, 652 F.3d 1160, 1170-71 (9th Cir. 2011)); see also United States v. Bradley, 390 F.3d 145, 150 (1st Cir. 2004), judgment vacated on other grounds, 545 U.S. 1101 (2005) (holding that serious harm encompasses "not only physical violence, but also more subtle psychological methods of coercion.").

Courts in this District have found liquidated damages provisions to constitute "serious harm" for purposes of 18 U.S.C. § 1589(a)(2) where defendants actually threatened to enforce the applicable provision.  See Magtoles v. United Staffing Registry, Inc., No. 21-CV-1850 (KAM), 2021 WL 6197063, at *5 (E.D.N.Y. Dec. 30, 2021) (finding "[d]efendants' alleged threats of litigation[] contribute to a plausible allegation of serious harm under the TVPA"); Paguirigan, 286 F. Supp. 3d at 438 (finding serious harm where "plaintiff alleges that she was . . . threatened with the prospect of paying a $25,000 contract termination fee," among other

damages); Javier v. Beck, No. 13-CV-2926 (WHP), 2014 WL 3058456, at *6 (S.D.N.Y. July 3, 2014) (finding serious harm where defendants "repeatedly threatened [plaintiff] that he would owe [defendants] $15,000 [through a confession of judgment] if he . . . left the defendants' employ").

### b.   Analysis

Defendants argue that the alleged threat to enforce the liquidated damages provision was no more than a "'permissible warning[] of adverse but legitimate consequences.'" (Def. Br. (Dkt. No. 33) at 17 (quoting Bradley, 390 F.3d at 151))

### i.   Liquidated Damages Provision

"[W]hen evaluating motions to dismiss under the TVPA, it is appropriate to make a preliminary assessment as to whether the complaint pleads sufficient facts to support a finding that a liquidated damages provision is an unenforceable penalty." Magtoles, 2021 WL 6197063, at *5 (citing inter alia, Paguirigan, 286 F. Supp. 3d at 439). "When assessing serious harm under the TVPA, it is not the amount of liquidated damages, per se, that controls the analysis. Rather, what matters is whether the specified liquidated damages in a given case rise to the level of serious harm considering all of the surrounding circumstances, including the employee's pay rate and the enforceability of the [contractual] term." Id. at *4 (internal citations and quotation marks omitted). "Because the enforceability of the liquidated damages provision depends on the facts and circumstances surrounding the contract . . . , it would be inappropriate to make a final determination on th[e] question at the pleading stage." Id. (citing JMD Holding Corp. v. Cong. Fin. Corp., 4 N.Y.3d 373, 379 (2005)).

As to enforceability, "'New York courts will construe a purported liquidated damages provision strictly,' and 'where the damages flowing from a breach of a contract are

easily ascertainable, or the damages fixed are plainly disproportionate to the contemplated injury, the stipulated sum will be treated as a penalty and disallowed.'"  Agerbrink v. Model Serv. LLC, 196 F. Supp. 3d 412, 417 (S.D.N.Y. 2016) (quoting U.S. Fid. & Guar. Co. v. Braspetro Oil Servs. Co., 369 F.3d 34, 71 (2d Cir. 2004)).

"With respect to enforceability, 'a foreign citizen recruited to a job opportunity in this country may not have a deep (or any) understanding of the legal system or their rights under that system. . . .  As a result, the in terrorem effect of [an unenforceable contractual] provision may well provide a form of "compulsion" for that foreign citizen to remain in their job, no matter how distasteful that job has become to them.'"  Magtoles, 2021 WL 6197063, at *4 (alteration in Magtoles) (quoting Dale Carmen v. Health Carousel, LLC, 2021 WL 2476882, at *6 (S.D. Ohio June 17, 2021)).

Here, the amount of liquidated damages at issue – $33,320 – is greater than amounts that have been found to threaten serious harm to similarly situated plaintiffs – namely, Filipino immigrants who came to the United States to work as healthcare professionals.  See Paguirigan, 286 F. Supp. 3d. at 438 ($25,000 liquidated damages provision threatened serious harm under the TVPA to Filipino nurse); Javier, 2014 WL 3058456, at *6 ($15,000 confession of judgment – signed by a Filipino physical therapist – "sufficient at [motion to dismiss] stage to satisfy the TVPA's 'serious harm' requirement"); see also Macolor v. Libiran, No. 14-CV-4555 (JMF) (RLE), 2016 WL 1488121, at *4 (S.D.N.Y. Mar. 25, 2016) ($20,000 liquidated damages provision threatened serious harm to Filipino physical therapist), report and recommendation adopted, 2016 WL 1453039 (S.D.N.Y. Apr. 13, 2016).

With respect to "pay rate," see Magtoles, 2021 WL 6197063, at *4, the Amended Complaint alleges that Baldia was paid $2,755.72 for one two-week period of work.  (Am.

Cmplt. (Dkt. No. 27) ¶ 92)  Assuming that Baldia earned that sum for each two-week pay period, her annual gross salary would amount to $71,648.72, just over double the amount of liquidated damages she would owe under the Employment Agreement.  In other words, if Baldia left RN Express after the summer 2019 meeting, she would owe RN Express roughly half a year's wages in liquidated damages.  See Javier, 2014 WL 3058456, at *6 (complaint plausibly alleged "serious harm" under the TVPA where liquidated damages amount "represented six months' gross wages").

As to the enforceability of the liquidated damages provision, Baldia "allege[s] sufficient facts to support a finding that [RN Express's] damages are easily ascertainable," such that the liquidated damages provision is unenforceable.  Magtoles, 2021 WL 6197063, at *5. For example, Baldia pleads that Defendants have recruited more than 100 Filipino nurses during the past ten years; they are thus familiar with the actual damages they would suffer in the event that a nurse did not complete her term of employment.  (Am. Cmplt. (Dkt. No. 27) ¶¶ 33, 126; see Magtoles, 2021 WL 6197063, at *6 (citing Paguirigan v. Prompt Nursing Emp. Agency, LLC, 827 F. App'x 116, 121 (2d Cir. 2020) ("[H]aving recruited Filipino nurses for years, it would be surprising if [Defendant] did not know what its . . . expenses would be."))

Baldia also "allege[s] . . . facts to support a finding that the liquidated damages provision is . . . disproportionate to [RN Express's] damages."  Magtoles, 2021 WL 6197063, at *5.  As an initial matter, Baldia alleges that "the amount of $33,320 . . . is disproportionate to the actual costs incurred by the Defendants."  (Am. Cmplt. (Dkt. No. 27) ¶ 120)  Defendants contend that Baldia has not sufficiently "explained why the $33,320 included in the liquidated damages provision was disproportionate to Defendant RN Express's actual or probable losses in the event of her breach."  (Def. Reply (Dkt. No. 36) at 14)  Baldia alleges, however, that she paid many of

15

the costs of her recruitment, including the fees and costs associated with her immigration

petition, and her travel expenses for the flight from the Philippines to New York.  (Am. Cmplt.

(Dkt. No. 27) ¶ 121)

   These allegations are sufficient to demonstrate that the liquidated damages

provision is unenforceable under New York law.  See Magtoles, 2021 WL 6197063, at *6 ("At

this stage . . . , the Court concludes that the Nurse Plaintiffs have pleaded sufficient facts to find

that the liquidated damages provision is unenforceable and thus supports a plausible claim of

serious harm under the TVPA.").  And "[b]ecause the enforceability of the liquidated damages

provision depends on the facts and circumstances surrounding the contract," Magtoles, 2021 WL

6197063, at *4 (citing JMD Holding Corp., 4 N.Y.3d at 379), this Court cannot resolve the

question as a matter of law at the motion to dismiss stage.[8]

   In sum, the Amended Complaint sufficiently alleges that the liquidated damages

provision threatened serious harm to Baldia under 18 U.S.C. § 1589(a)(2).

---

[8]  In arguing that the liquidated damages provision is enforceable, Defendants assert that the amount Baldia owed diminished over time.  Defendants also cite to Time Assocs. Inc. v. Blake Realty Inc., 212 A.D.2d 879, 882 (3d Dept. 1995) and JMD Holding Corp., 4 N.Y.3d at 377, where similar provisions were upheld.  (Def. Br. (Dkt. No. 33) at 29-30 (citing Employment Agmt. (Dkt. No. 34-1) ¶ 10(b)))

As to the first point, the liquidated damages here only began to diminish after an employee completed a full year of employment, and only decreased by "1/24 of the Company Recruitment Costs" each month thereafter.  (Employment Agmt. (Dkt. No. 34-1) ¶ 10(b))  At the time of the Defendants' alleged threat – late June or early July 2019 (Am. Cmplt. (Dkt. No. 27) ¶ 102) – Baldia had worked for RN Express for less than a year.  (See id. ¶ 64)  Accordingly, at that time, she faced the full $33,320 sanction.

As to the cases cited by Defendants, they were decided at summary judgment, see JMD Holding Corp., 4 N.Y.3d at 379, or post-trial, see Times Assocs. Inc., 212 A.D.2d at 881-82, and thus are not on point.

ii.     <u>**Threat to Enforce the Liquidated Damages Provision**</u>

Defendants' threat to enforce the liquidated damages provision provides further factual support for Baldia's claim under 18 U.S.C. § 1589(a)(2).  (Am. Cmplt. (Dkt. No. 27) ¶ 107)

While Defendants contend that Baldia "does not allege any form of . . . threat" (Def. Br. (Dkt. No. 33) at 19), this argument "ignores the context of the [alleged] threat." <u>Javier</u>, 2014 WL 3058456, at *6.  Under 18 U.S.C. § 1589(c)(2), this Court must consider "all the surrounding circumstances" in which Defendants Alejandrino and Nunez told Baldia that RN Express would enforce the liquidated damages provision in determining whether what they said amounts to a "threat of serious harm" under the TVPA.  <u>See</u> 18 U.S.C. §§ 1589(a)(2), (c)(2).

According to the Amended Complaint, the purpose of the 2019 meeting at RN Express's New York office was to address Baldia's wage complaints.  (Am. Cmplt. (Dkt. No. 27) ¶¶ 102-03)  Prior to the meeting, in November 2018, Baldia had complained to Defendant Alejandrino that she was being paid at a rate much less than the agreed-upon "prevailing wage rate."  (<u>Id.</u> ¶¶ 76-79)  At the meeting with Defendants Alejandrino and Nunez, Baldia repeated her complaint about the wage rate, and also complained that she was not being paid for all the hours that she had worked.  (<u>Id.</u> ¶ 103)  It was after Baldia made these complaints that Defendants "told her that she would be liable for the $33,320 [in] liquidated damages if she tried to stop working for [RN Express] or s[ought] other employment."  (<u>Id.</u> ¶ 107)  Baldia reasonably understood Defendants' statements to constitute a threat that they would initiate litigation against her to enforce the liquidate damages provision, and that "the costs of defending herself" against such an action "would cause her to suffer serious harm.  (<u>Id.</u> ¶ 128)

Given this sequence of events, and the fact that Baldia had immigrated to the United States less than a year before the meeting (id. ¶ 63), her acquiescence to Defendants' threat could be seen as "objectively reasonable under the circumstances."  See Rivera, 799 F.3d at 186.  As in Javier, "[r]egardless of whether the [liquidated damages provision] was enforceable, the [Amended] Complaint [plausibly] alleges that the Defendants used it as a threat to obtain [Baldia's] continued services."  Javier, 2014 WL 3058456, at *6.

Having considered "all the surrounding circumstances" that are alleged in the Amended Complaint, this Court concludes that Baldia has sufficiently alleged a threat of serious harm under 18 U.S.C. § 1589(a)(2).

Accordingly, Defendants' motion to dismiss this claim is denied.

## 2.      Threatened Abuse of Legal Process under § 1589(a)(3)

Defendants contend that Baldia has not sufficiently stated a TVPA claim for "abuse of the immigration sponsorship process" under § 1589(a)(3).  (Def. Br. (Dkt. No. 33) at 14-16)  According to Defendants, Baldia has not pled facts demonstrating that Defendants' "alleged 'abuse' of the 'immigration sponsorship process' forced her to remain working for the Defendants."  (Id. at 15)  Defendants also point out that Baldia "possessed an EB-2 permanent residency visa and was therefore not subject to deportation or any similar threat."  (Def. Reply (Dkt. No. 36) at 8)

Baldia responds that Defendants "abused the immigration sponsorship process by misrepresenting . . .  that she would be properly paid the prevailing wage rate, [and] luring [her] into being sponsored by Defendants and into working for [RN Express]."  (Pltf. Opp. (Dkt. No. 35) at 19)  Baldia further argues that Defendants violated 18 U.S.C. § 1589(a)(3) by threatening

to enforce the liquidated damages provision to coerce her "into continuing her employment with the Defendants, despite her [wage] complaints." (Id. at 20)

### a.   **Applicable Law**

For purposes of § 1589(a)(3),

[t]he term "abuse or threatened abuse of law or legal process" means the use or threatened use of a law or legal process, whether administrative, civil, or criminal, in any manner or for any purpose for which the law was not designed, in order to exert pressure on another person to cause that person to take some action or refrain from taking some action.

18 U.S.C. § 1589(c)(1).

Threats to expose a plaintiff to deportation or to cancel their immigration sponsorship amount to "abuse of legal process" in the context of Section 1589(a)(3). Adia v. Grandeur Mgmt., Inc., 933 F.3d 89, 93 (2d Cir. 2019) ("[T]he defendants' alleged threat to cancel [plaintiff's] sponsorship constitutes abuse of legal process for purposes of subsection 1589(a)(3)."); Aguirre v. Best Care Agency, Inc., 961 F. Supp. 2d 427, 444 (E.D.N.Y. 2013) ("The threat of deportation alone may support a claim for forced labor.").  Moreover, threats of litigation can also amount to a "threatened abuse of law or legal process" for purposes of this subsection.  See Magtoles, 2021 WL 6197063, at *8 ("Defendants' alleged threats of . . . litigation also support a claim based on an abuse of legal process under Section 1589(a)(3).").

### b.   **Analysis**

The Amended Complaint alleges that Defendants threatened "that [Baldia] would be liable for the $33,320 [in] liquidated damages if she tried to stop working or seek other employment."  (Am. Cmplt. (Dkt. No. 27) ¶ 107)  These allegations plausibly suggest a "threatened abuse of law or legal process."  See Magtoles, 2021 WL 6197063, at *8 (allegations

"that Defendants have . . . threatened litigation to coerce employees like Plaintiffs into continuing to work for [Defendants]" support a plausible claim under § 1589(a)(3)); see also United States v. Calimlim, 538 F.3d 706, 713 (7th Cir. 2008) ("[T]heir 'warnings' about the consequences were directed to an end different from those envisioned by the law and were thus an abuse of the legal process . . . . fit[ting] within the scope of § 1589(a)(3).").  As discussed above, the context in which Nunez and Alejandrino reminded Baldia of her liability under the liquidated damages provision plausibly suggests that they did so "in order to exert pressure on [Baldia] to cause" her to remain working at RN Express and "refrain" from renewing her wage complaints.  See 18 U.S.C. § 1589(c)(1).

Panwar v. Access Therapies, Inc., 2015 WL 1396599, at *4-5 (S.D. Ind. Mar. 25, 2015), cited by Defendants (Def. Br. (Dkt. No. 33) at 18-19; Def. Reply (Dkt. No. 36) at 9), is not to the contrary.  In Panwar, the court found at summary judgment that "[i]t is not an abuse of legal process to enforce valid contractual rights against individuals who no longer wish to be bound by the terms of an agreement they voluntarily signed."  Id. at *5.  The court noted that the liquidated damages provision at issue in that case was "lawful under both the H-1B [immigration] regulations and under Indiana law."  Id. at *4.  Panwar is not on point here, both because it was decided at summary judgment and because the Amended Complaint adequately pleads that the liquidated damages provision is not enforceable under New York law.

Drawing all reasonable inferences in Plaintiff's favor, Defendants' threat to enforce an allegedly unenforceable liquidated damages provision implies an attempt to initiate legal action "for which the law was not designed," and supports a claim for "threatened abuse of law or legal process."  18 U.S.C. §§ 1589(a)(3), (c)(1).

Accordingly, Defendants' motion to dismiss Baldia's claim under 18 U.S.C. § 1589(a)(3) is denied.

### 3.   Scheme, Pattern, or Plan under § 1589(a)(4)

Defendants do not address Baldia's claim under § 1589(a)(4).  (See Def. Br. (Dkt. No. 33); Def. Reply (Dkt. No. 36))  Accordingly, their motion is denied as to Baldia's Section 1589(a)(4) claim for reasons stated above.

### 4.   Intent under § 1589

Defendants argue that Plaintiff has not sufficiently alleged intent for purposes of a Section 1589 violation.  (Def. Br. (Dkt. No. 33) at 20; see Def. Reply (Dkt. No. 36) at 10)  Baldia counters that "intent . . . and other conditions of a person's mind may be alleged generally." (Pltf. Opp. (Dkt. No. 35) at 22 (quoting Fed. R. Civ. P. 9(b))  Baldia further argues that Defendants' statement that "they hoped [Baldia] would not be a problem employee who complained too much," and "threat[] of . . . abusive legal action," creates an "inference" that they intended "to cause [Baldia] to believe that she would suffer financial . . . harm if she did not continue working for [RN Express]."  (Id.; Am. Cmplt. (Dkt. No. 27) ¶ 107)

Under Section 1589, a defendant must "knowingly provide[] or obtain[] the labor or services of a person" using one of the wrongful means listed in the statute.  18 U.S.C. § 1589(a).  "Subsection (a)(4) [of § 1589] 'contains a second scienter requirement,' requiring a showing that the defendant knowingly used a scheme, plan, or pattern 'intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint.'"  Magtoles, 2021 WL 6197063, at *9 (quoting Paguirigan, 2019 WL 4647648, at *19).  As stated in Paguirigan, "'the linchpin of the serious harm analysis under § 1589 is not just that serious harm was threatened but that the

employer intended the victim to believe that such harm would befall her' if she left her

employment." Paguirigan, 286 F. Supp. at 438 (quoting United States v. Dann, 652 F.3d 1160,

1170 (9th Cir. 2011)).  "In considering whether the employer intends the victim to believe she

cannot leave, we must 'consider the particular vulnerabilities of a person in the victim's

position,' though the victim's acquiescence must be objectively reasonable under the

circumstances."  Id. (quoting Rivera, 799 F.3d at 186).

       Finally, although Federal Rule of Civil Procedure 9(b) states that "conditions of a

person's mind may be alleged generally," allegations of intent must still comply with the

"strictures of Rule 8."  Iqbal, 556 U.S. at 687.  Accordingly, "'Rule 8's plausibility standard

applies to pleading intent.'"  Whiteside v. Hover-Davis, Inc., 995 F.3d 315, 323 (2d Cir. 2021)

(quoting Biro v. Conde Nast, 807 F.3d 541, 545 (2d Cir. 2015)).

       Here, the Amended Complaint pleads facts that support a plausible inference that

Defendants knowingly threatened Baldia with serious harm, and that Defendants intended for

Baldia to believe that she would suffer serious harm if she left RN Express.  (See Am. Cmplt.

(Dkt. No. 27) ¶¶ 117, 197)  The Amended Complaint alleges that the liquidated damages

provision is part of RN Express's "standard employment agreement."  (Id. ¶¶ 33, 47-50)  RN

Express was a party to these contracts, and Defendant Alejandrino signed Baldia's version on

behalf of the company.  (Employment Agmt. (Dkt. No. 34-1) at 11)  Likewise, Defendant

Alejandrino signed Baldia's offer letter on behalf of RN Express.  (May 3, 2018 Offer Ltr. (Dkt.

No. 34-2))

       As discussed above, the Amended Complaint adequately pleads that the

liquidated damages provision in the Employment Agreement is unenforceable.  When

Defendants' alleged threat to enforce the provision (Am. Cmplt. (Dkt. No. 27) ¶ 107) is

considered together with "Defendants' incorporation of the[] facially dubious [liquidated damages] provision[] into the contracts[,] . . . a plausible inference [arises] that Defendants intended to coerce the Nurse Plaintiff[] into continuing to work for [RN Express]."[9]  See Magtoles, 2021 WL 6197063, at *9.

Moreover, given that Alejandrino and Nunez controlled Baldia's work schedule and supervised her work (Am. Cmplt. (Dkt. No. 27) ¶ 22), their alleged reduction of her wage rate and the actual hours she worked supports an inference of intent.

Accordingly, Defendants' motion to dismiss Baldia's claim for failure to sufficiently plead intent under 18 U.S.C. § 1589(a) is denied.

### 5.   Venture Liability under § 1589(b)

Baldia also alleges that Defendants violated § 1589(b) of the TVPA.  (See id. ¶¶ 148-49)  Defendants do not address the § 1589(b) claim in their briefing.  (See Def. Br. (Dkt. No. 33); Def. Reply (Dkt. No. 36))  Accordingly, their motion to dismiss is denied as to Plaintiff's Section 1589(b) claim.

### B.   Trafficking Claim under 18 U.S.C. § 1590

Baldia also alleges that Defendants violated § 1590 of the TVPA.  (See Am. Cmplt. (Dkt. No. 27) ¶¶ 149-50)  Defendants argue that because Baldia "has failed to adequately allege that [they] engaged in forced labor in violation of Section 1589, her Section 1590 claim for trafficking should also be dismissed."  (Def. Br. (Dkt. No. 33) at 14 n.8)

18 U.S.C. § 1590(a) makes it unlawful to "knowingly recruit[], harbor[], transport[], provide[], or obtain[] by any means, any person for labor or services in violation of

---

[9]  Muchira v. Al-Rawaf, 850 F.3d 605, 620 (4th Cir. 2017) and Panwar, 2015 WL 1396599, at *3, cited by Defendants (Def. Br. (Dkt. No. 33) at 21; Def. Reply (Dkt. No. 36) at 11), were decided at summary judgment, and thus are not on point.

this chapter." 18 U.S.C. § 1590(a).  "[I]f a defendant violates section 1589, he also violates

section 1590 if he recruited the person to perform forced labor."  Adia, 933 F.3d at 94.

Here, Baldia alleges that the individual Defendants, on behalf of RN Express,

recruited her to come to the United States to provide nursing services, and that she subsequently

worked for RN Express in New York.  (Am. Cmplt. (Dkt. No. 27) ¶¶ 33-34)  As discussed

above, Baldia has plausibly alleged claims under Section 1589(a).  Plaintiff's well-pled claims

under Section 1589(a) and the Amended Complaint's allegations concerning Defendants'

recruitment of her are sufficient to state a claim for trafficking.  See Adia, 933 F.3d at 94.

Accordingly, Defendants' motion to dismiss the Section 1590 claim is denied.  See Walia, 2015

WL 4743542, at *5 ("[B]ecause Plaintiff's claims of forced labor . . . survive the motion to

dismiss, so too do his claims under 18 U.S.C. § 1590(a)."); Franco, 51 F. Supp. 3d at 247 ("By

combining these claims with the alleged violations of Section 1589(a) . . . , plaintiff has stated a

claim under Section 1590(a).").

## C.    Conspiracy and Attempt Claims under 18 U.S.C. § 1594(a)-(b)

The Amended Complaint includes claims for conspiracy and attempt to violate

the TVPA under 18 U.S.C. §§ 1594(a)-(b).  (Am. Cmplt. (Dkt. No. 27) ¶¶ 153-63)  Defendants

do not address these claims in their motion to dismiss.  (See Def. Br. (Dkt. No. 33); Def. Reply

(Dkt. No. 36))  Accordingly, their motion to dismiss is denied as to Plaintiff's conspiracy and

attempt claims under Section 1594(a)-(b).

## III.    FLSA AND NYLL CLAIMS

Baldia also asserts claims under the FLSA and the NYLL for minimum wage

violations and unpaid overtime.  (Am. Cmplt. (Dkt. No. 27) ¶¶ 164-180)

24

A.     <u>**Minimum Wage Claims**</u>

Defendants argue that Baldia has not pled minimum wage violations under the

FLSA or NYLL because she alleges that Defendants paid her at least $33 per hour – well above

the federal minimum wage and "a rate over two times New York's minimum wage of $15.00

[per] hour."  (Def. Br. (Dkt. No. 33) at 22)  Baldia counters that the effective rate of "$33 to $34

per hour for all of her hours of work does not remove the fact that Defendants failed to pay her

for all of her hours of work."  (Pltf. Opp. (Dkt. No. 35) at 23-24)

Under the FLSA, covered employers are required to pay employees a minimum

wage of $7.25 per hour.  29 U.S.C. § 206(a)(1)(C).  Under the NYLL, "[e]very employer shall

pay to each of its employees for each hour worked in the count[y] of Nassau . . . a wage not less

than . . . $12.00 per hour on and after December 31, 2018 . . . or, if greater, such other wage as

may be established by federal law pursuant to 29 U.S.C. § 206 . . . ."  N.Y. Lab. Law § 652(b).

For the period between December 31, 2017 and December 31, 2018, the applicable minimum

wage in Nassau County, New York was $11.00 per hour.  <u>Id.</u>

Under either law, Baldia has failed to state a claim.   Under the FLSA and NYLL,

"[a]n employee cannot state a claim for a minimum wage violation 'unless [her] average hourly

wage falls below the . . . minimum wage.'"  <u>Lopez-Serrano v. Rockmore</u>, 132 F. Supp. 3d 390,

402 (E.D.N.Y. 2015) (quoting <u>Lundy v. Catholic Health Sys. of Long Island, Inc.</u>, 711 F.3d 106,

115 (2d Cir. 2013)).  "Under what has become known as the <u>Klinghoffer</u> rule, no minimum wage

violation occurs so long as the total wage paid to an employee in any given workweek divided by

the total hours worked in the workweek equals or exceeds the applicable minimum wage."  <u>Hart</u>

<u>v. Crab Addison, Inc.</u>, No. 13-CV-6458 (CJS), 2014 WL 2865899, at *11 (W.D.N.Y. June 24,

2014) (citing <u>United States v. Klinghoffer Bros. Realty Corp.</u>, 285 F.2d 487, 490 (2d Cir. 1960)).

"[A]s long as a Plaintiff's average wage exceeds the federal minimum wage, it does not matter how that average is calculated."  Alfonso v. Mougis Logistics Corp., No. 21-CV-5302 (LJL), 2021 WL 5771769, at *4 (S.D.N.Y. Dec. 6, 2021) (citing Cruz v. AAA Carting & Rubbish Removal, Inc., 116 F. Supp. 3d 232, 242 (S.D.N.Y. 2015)).

Here, Baldia claims that Defendants initially "paid her an hourly wage rate of about $33.00," and "continued to effectively pay [her] . . . only about $33.00 to $34.00 [per hour] through her last day of work."  (Am. Cmplt. (Dkt. No. 27) at ¶¶ 81, 84)  Indeed, nowhere in the Amended Complaint does Baldia allege that her "average hourly wage f[ell] below the . . . minimum wage."  Lundy, 711 F.3d at 115.  Because Baldia has not alleged a workweek in which her average hourly wage fell below the federal minimum wage or the applicable New York minimum wage, she has failed to state a minimum wage claim under the FLSA or the NYLL. See Hart, 2014 WL 2865899, at *11 (dismissing FLSA minimum wage claim "since the pleading never alleges that during any particular week, the average of the Plaintiffs' hourly wages was less than the federal minimum wage").

Accordingly, Baldia's minimum wage claims under the FLSA and NYLL are dismissed.

## B.  **Overtime Claims**

Defendants contend that Baldia has likewise failed to state claims for unpaid overtime wages under the FLSA and the NYLL.  (Def. Br. (Dkt. No. 33) at 23-25)  Baldia responds that "[b]y arbitrarily reducing and unilaterally misreporting Plaintiff's work-hours through reduction of said work-hours, Defendants avoided ever recording that [she] had worked more than 40 hours in any workweek."  (Id. ¶ 99)

1.     **Applicable Law**

The FLSA requires that weekly hours worked beyond 40 be paid at "a rate not less than one and one-half times the regular rate."  29 U.S.C. § 207(a)(1).  An employee's "regular rate" must include "all remuneration for employment paid to, or on behalf of, the employee," with several enumerated exceptions.  29 U.S.C. 207(e).  "[T]he regular rate refers to the hourly rate actually paid the employee for the normal, non-overtime workweek for which he is employed."  Walling v. Youngerman-Reynolds Hardwood Co., 325 U.S. 419, 424 (1945); see also Pineda v. Masonry Const., Inc., 831 F. Supp. 2d 666, 676 (S.D.N.Y. 2011) ("The regular rate of pay is the hourly rate paid to the employee for a typical week.").  "The actual events that occur during an employment relationship – as opposed to a governing contract . . . determine the 'regular rate' of pay."  Foster v. City of New York, No. 14-CV-4142 (PGG), 2017 WL 11591568, at *33 (S.D.N.Y. Sept. 30, 2017) (citing, inter alia, Bay Ridge Operating Co. v. Aaron, 334 U.S. 446, 463-65 (1948)).  "[T]he regular rate 'is not an arbitrary label chosen by the parties; it is an actual fact.'"  Gorman v. Consol. Edison Corp., 488 F.3d 586, 597 (2d Cir. 2007) (quoting Walling, 325 U.S. at 424); see also id. ("'[T]he regular rate of pay cannot be left to a declaration by the parties as to what is to be treated as the regular rate for an employee; it must be drawn from what happens under the employment contract.'" (quoting Bay Ridge Operating Co., 334 U.S. at 464)).

"[I]n order to state a plausible FLSA overtime claim, a plaintiff must sufficiently allege 40 hours of work in a given workweek as well as some uncompensated time in excess of the 40 hours."  Lundy, 711 F.3d at 114 (citing 29 U.S.C. § 207(a)(1)).  "'The burden placed on plaintiffs is not an onerous one.  They are not required to state every single instance of overtime work or to state the exact amount of pay which they are owed; instead, they are only required to

provide some approximation of the overtime hours that they worked.'" Bachayeva v. Americare Certified Special Servs., Inc., No. 12-CV-1466 (RRM), 2013 WL 1171741, at *6 (E.D.N.Y. Mar. 20, 2013) (quoting DeSilva v. N. Shore-Long Island Jewish Health Sys., Inc., 770 F. Supp. 2d 497, 510 (E.D.N.Y. 2011)).

Overtime claims under the NYLL "are evaluated under the same standards as claims under the [FLSA]." Hobbs v. Knight-Swift Transportation Holdings, Inc., No. 21-CV-1421 (AT), 2022 WL 118256, at *3 (S.D.N.Y. Jan. 12, 2022).

### 2.   Analysis

The Amended Complaint provides one example of a week in which Baldia worked in excess of 40 hours. (See Am. Cmplt. (Dkt. No. 27) ¶ 87)  Baldia claims that during that week – October 27, 2019 through November 2, 2019 – she worked a total of 46 hours, but her timesheet reflects only 34.52 hours of work. (Id. ¶¶ 87, 89)

Given Baldia's allegation that she was only paid for 34.52 hours of work – despite having worked 46 hours – it is obvious that she did not receive appropriate overtime compensation. Accordingly, Defendants' motion to dismiss Baldia's overtime claims is denied.

## IV.   BREACH OF CONTRACT CLAIM

Baldia asserts a breach of contract claim based on Defendants' (1) failure to pay her based on "prevailing wage law"; and (2) "deducting work-hours from [her] . . . actual hours of work." (Am. Cmplt. (Dkt. No. 27) ¶¶ 34-35, 49, 186-87; see Employment Agmt. (Dkt. No. 34-1) ¶ 7)

Defendants contend that Baldia was paid the correct prevailing wage rate, given that she "requested and accepted a position at Harborside as a Registered Nurse (not supervisor)" and was compensated in accordance with that position. (Def. Br. (Dkt. No. 33) at 26; Def. Reply

(Dkt. No. 36) at 13)  Defendants further argue that Baldia's refusal "to work at a different facility as an RNS with commensurate higher pay" undermines her breach claim.  (Def. Reply (Dkt. No. 36) at 13)  Baldia counters that "Defendants did not pay [her] the prevailing wage" "as determined by the U.S. Department of Labor," nor did they "pay her for all of her hours of work."  (Pltf. Opp. (Dkt. No. 35) at 28 (citing Am. Cmplt. (Dkt. No. 27) ¶¶ 34-35, 49))

### A.    Applicable Law

"'To state a claim for breach of contract under New York law, the complaint must allege:  (i) the formation of a contract between the parties; (ii) performance by the plaintiff; (iii) failure of defendant to perform; and (iv) damages.'"  Edwards v. Sequoia Fund, Inc., 938 F.3d 8, 12 (2d Cir. 2019) (quoting Orlander v. Staples, Inc., 802 F.3d 289, 294 (2d Cir. 2015)).  "At the motion to dismiss stage, the court resolves any contractual ambiguities in favor of the plaintiff, and if the plaintiff has an arguable claim under the contract, then the claim should not be dismissed."  Hermant Patel M.D., P.C. v. Bandikatla, No. 18-CV-10227 (LGS), 2019 WL 6619344, at *2 (S.D.N.Y. Dec. 5, 2019) (citing Subaru Distribs. Corp. v. Subaru of Am., Inc., 425 F.3d 119, 122 (2d Cir. 2005)).

### B.    Analysis

Here, the Employment Agreement provides that Baldia "will be paid . . . the prevailing wage for the occupation as determined by the U.S. Department of Labor for the particular Facility to which Healthcare Professional is assigned."  (Employment Agmt. (Dkt. No. 34-1) ¶ 7)

Contrary to Defendants' assertion that Baldia "requested and accepted a position at Harborside as a Registered Nurse" (Def. Reply (Dkt. No. 36) at 13), the Amended Complaint pleads that Defendants "required her to work as a nurse with the title of Registered Nurse [at

Harborside], and not of Registered Nurse Supervisor." (Am. Cmplt. (Dkt. No. 27) ¶ 74) Despite the Registered Nurse title, Baldia "actually performed the duties and responsibilities of a Registered Nurse Supervisor" at Harborside. (Id. ¶ 75) The Amended Complaint also alleges that the Defendants arbitrarily reduced her work hours "to make it appear that Plaintiff was receiving the prevailing wage rate . . . , when she was actually being paid only about $33 per hour, or more than $10 less than the required wage." (Id. ¶ 98) And while Defendant Alejandrino promised Baldia that she would eventually be compensated at "her offered prevailing wage rate," Defendants never fulfilled that promise. (Id. ¶ 79)

These allegations are sufficient to state a claim for breach of contract. Accepting Baldia's allegation that she "performed the duties and responsibilities of a Registered Nurse Supervisor" (Id. ¶ 75) – but was only paid the prevailing wage of a registered nurse – Defendants did not pay her "the prevailing wage for [her] occupation," as they had promised to do in the Employment Agreement. (Employment Agmt. (Dkt. No. 34-1) ¶ 7)

Accordingly, Defendants' motion to dismiss Baldia's breach of contract claim is denied.

## V. **DECLARATORY JUDGMENT CLAIM**

In the Amended Complaint, Baldia seeks a declaration that the liquidated damages provision in her Employment Agreement is unenforceable. (Am. Cmplt. (Dkt. No. 27) ¶ 218) Defendants contend that Baldia's claim for declaratory relief should be dismissed because they "have not sought to enforce any of the provisions of the Employment Agreement [against her,] . . . either in this Court or in any other manner." (Def. Reply (Dkt. No. 36) at 13; see Def. Br. (Dkt. No. 33) at 28-29) Baldia counters that "there is a substantial controversy in this case concerning whether [she] and other putative class members may be sued under their

contracts' $33,320 liquidated damages provisions for resigning prior to the end of their contract terms."  (Pltf. Opp. (Dkt. No. 35) at 31)

### A.    <u>Applicable Law</u>

The Declaratory Judgment Act provides that, "[i]n a case of actual controversy within its jurisdiction, . . . any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration. . . ."  28 U.S.C. § 2201(a).  The Act thus "confers on federal courts 'unique and substantial discretion in deciding whether to declare the rights of litigants.'"  <u>Peconic Baykeeper, Inc. v. Suffolk Cty.</u>, 600 F.3d 180, 187 (2d Cir. 2010) (quoting <u>Wilton v. Seven Falls Co.</u>, 515 U.S. 277, 286 (1995)).

"A request for a declaratory judgment is constitutionally ripe for review when there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality."  <u>MPM Silicones, LLC v. Union Carbide Corp.</u>, 966 F.3d 200, 232 n.44 (2d Cir. 2020)

### B.    <u>Analysis</u>

Defendants' representation that they have no present intention to enforce the liquidated damages provision against Baldia does not justify dismissing her claim for declaratory relief.  As in <u>Magtoles</u>, "Defendants have not . . . 'definitively stated' that they will not seek to enforce the liquidated damages provision . . . against the Nurse Plaintiffs in the future."  <u>Magtoles</u>, 2021 WL 6197063, at *11 (quoting <u>Denson v. Donald J. Trump for President, Inc.</u>, 530 F. Supp. 3d 412, 428 (S.D.N.Y. 2021); citing <u>Arakelian v. Omnicare, Inc.</u>, 735 F. Supp. 22, 41 (S.D.N.Y. 2010) ("[The defendant] cannot move to dismiss [plaintiff's] claim [for declaratory judgment]; refuse to agree not to enforce the [agreement]; and at the same time claim that [plaintiff] has not shown that it intends to enforce the agreement.")).  Given the six-year

statute of limitations applicable to breach of contract actions in New York, see C.P.L.R. §
213(2), and the Amended Complaint's allegation that Defendants have threatened to enforce the
liquidated damages provision against Baldia and other employees (Am. Cmplt. (Dkt. No. 27) ¶¶
69, 107, 194), Baldia has sufficiently pled that a controversy exists between the parties that
warrants a declaratory judgment.  See Magtoles, 2021 WL 6197063, at *11 ("[R]esolving
uncertainty about issues like whether the Nurse Plaintiffs may seek other employment, and
whether they must pay liquidated damages to United Staffing, 'is one of the main purposes of
declaratory judgments.'" (quoting Arakelian, 735 F. Supp. 2d at 41)).

          Accordingly, Defendants' motion to dismiss the Amended Complaint's
declaratory judgment claim is denied.

## CONCLUSION

          For the reasons stated above, this Court's September 30, 2022 Order grants
Defendant's motion to dismiss as to Baldia's minimum wage claims under the FLSA and NYLL,
but otherwise denies Defendants' motion.

          The Court will conduct a conference in this matter on **October 13, 2022, at 9:30
a.m.** in Courtroom 705 of the Thurgood Marshall United States Courthouse, 40 Foley Square,
New York, New York.  The parties are directed to jointly submit an amended Case Management
Plan one week before the conference.

Dated: New York, New York
          October 3, 2022

                                        SO ORDERED.

                                        _____
                                        Paul G. Gardephe
                                        United States District Judge